R. TROUP *against* W. WOOD and S. SHERWOOD.

Where a judgment and execution, which had been fully paid and satis-fied, were kept on foot by the assignees of the judgment, fraudulent-ly, for the purpose of speculating on the property of the debtor, of which the defendants, assignees or owners of such judgment, became purchasers at a sheriff's sale, they were decreed to execute a *release* of all their title and interest so acquired, to the owner of the lands so fraudulently sold in execution, and to deliver up the possession thereof, and to pay the rents, and profits, and damages, for any *waste* committed, with all costs, &c.

A judgment, after it has been fully paid, cannot be kept on foot to cover any new demands of the plaintiff.

It seems, that a person convicted of felony, and sentenced to impri-sonment in the state prison for life, is *civiliter mortuus.* Therefore, writs of *scire facias,* issued to such convict, and not to his legal re-presentatives, or terre-tenants, to revive a judgment against him, and *nihil* returned thereon, can have no legal operation or effect whatever.

An agreement by the owner of an execution, on which lands to an amount in value far exceeding the debt had been seized, to prevent the usual competition at the sheriff's sale, and in order to leave a

balance due on the execution, for the purpose of having lands of the debtor, in other counties, seized and sold, is fraudulent. And the execution is deemed, in law, satisfied.

Where the sheriff seizes sufficient property of the debtor, under an execution, the debtor is discharged from the judgment, and the plaintiff must look to the sheriff for his money.

1820.

TROUP
v.
WOOD.

Nov. 10th,
and 12th,
1819, and
Jan. 4th, 1820.

THE bill, filed in *July*, 1812, stated, that the plaintiff was seised in fee of lot No. 33, in *Lysander*, in *Onondaga* county, and of lot No. 76, in *Solon*, in *Cortlandt* county, which he purchased, in 1792, *bona fide*, and for a valuable consideration, of *Henry Platner*. That the plaintiff took possession of the lots, and continued in the enjoyment thereof, until disturbed by the defendants. That in *April* term, 1787, *Abraham Bachman* obtained a judgment against *H. Platner*, in the *Supreme Court*, for 773 pounds, debt, and 6 pounds 18 shillings, costs, and the judgment was docketted the 16th of *April*, 1787. The plaintiff, when he purchased the lots, was ignorant of the judgment. That *Bachman* and *Platner*, having had various dealings together, before and after the judgment, came to a settlement of their accounts on the 4th of *July*, 1798, in which settlement, the judgment was included; and a considerable balance was found due to *P.* from *B.*, for the payment of which he executed a bond to *P.* on the same day. That on the settlement, a receipt in full for the judgment was given by *B.* to *P.*, which receipts, together with other receipts for previous payments on the judgment, came to the hands of *Charles Vincent*, the son-in-law of *P.* who had access to his papers, shortly after the imprisonment of *P.* That *C. V.* delivered the receipts to *B.* or to *Jacob F. Miller*, his executor, or to *Jacob R. Van Rensselaer*, after the death of *Miller*. That satisfaction of the judgment was neglected to be entered on record. That *P.* was convicted of forgery, in *June*, 1799, and sentenced to the state prison for life, and continued in prison until the 10th of *June*, 1806, when he was

pardoned. That in *October* term, 1799, the judgment was fraudulently revived by two writs of *scire facias*, returned *nihil*, and which were issued by *B.*, or by some other person, with his privity, both of them well knowing that the judgment was satisfied. That in the vacation following *October* term, *B.* or some other person, with his privity, issued a *test fi. fa.* on the judgment, to the sheriff of *Ontario* county, who sold, as the property of *P.*, three lots of land, and part of another, containing above 841 acres of land, for 332 dollars and 25 cents. That *B.* having died soon after the execution had issued, the judgment was fraudulently revived, in the names of *George Monell, Jacob F. Miller*, and *Catharine Bachman*, as executors of *B.*, in *October* term, 1800. That *Monell*, soon after the revival of the judgment, being informed that the judgment had been satisfied, refused to be concerned in any further proceedings upon it, and requested of *Miller* an indemnity for all claims against him as executor, which *Miller* gave to him, accordingly. That *Miller*, afterwards, well knowing that the judgment had been satisfied, fraudulently sold and assigned it to *Jacob R. Van Rensselaer*, for some trifling consideration. That *Van Rensselaer*, before he took the assignment, knew, or had grounds to believe, or suspect, that the judgment had been satisfied. That he, afterwards, as assignee, in the vacation after *October* term, 1802, fraudulently issued a *test fi. fa.* on the said judgment, to the sheriff of *Delaware*, requiring him to levy 689 dollars and 48 cents, as the residue of the judgment. That the sheriff seized several lots in *Delhi*, owned by persons deriving title from *P.*, who, in order to protect themselves, agreed with the defendant, *Samuel Sherwood*, either as agent of *J. R. Van Rensselaer*, or as having an interest in the judgment, that the sheriff should set up their respective lots for sale, and the owners purchase them for some trifling consideration, and receive deeds from the sheriff, and that the owners should be responsible for the

payment of the 689 dollars and 48 cents, in proportion to the quantity of land owned by them respectively; that the greater part of the said sum should be immediately paid, and for the balance, an execution should issue for the sale of the lands in the military tract, and if they failed to produce the balance, the owners of the said lots should pay it in the proportions above mentioned. That the defendant S., who had the entire direction of the sale, either as agent, or as having an interest therein, procured the sheriff to assist in carrying the agreement into effect; and he, accordingly, sold the lots to the owners thereof, for trifling sums, executed deeds to them, and returned on the execution, that he had levied 402 dollars and 80 cents, and that *Platner* had no other lands, &c. on which to levy the residue. That the said owners of lots paid the greater part of the 689 dollars and 48 cents under the agreement; and for the residue, several other writs of *test. fi. fa.* were fraudulently issued for the sale of lots in the military tract. That the defendant S., at the time of the said sale, had notice, or had ground to believe or suspect, that the said judgment had been satisfied before issuing the said execution to the sheriff of *Delaware*; but conceiving† the design of a fraudulent and profitable speculation, owing to the situation of *Platner*, by overreaching, by means of sales under the judgment, titles derived from *P.*, and by selling the remainder of the lots owned by him for nominal prices. That in pursuance of such fraudulent design, the defendant S. made the said agreement, and procured it to be carried into effect; and proposed to the defendant *W.*, who resided on the military tract, to be concerned with him in the purchase of lands in that tract. That the defendant *W.*, with notice of this corrupt and fraudulent design of the defendant S., fraudulently agreed to the proposal, and the two defendants associated accordingly for that purpose. That the defendants then procured from *J. R. Van Rensselaer*, or some other person, an assignment of the said judgment, for a trifling sum, but

† conceived

with notice to both, or with grounds to believe, or suspect, that the judgment had been satisfied. That the defendants, as assigness of the said judgment, and in prosecution of their corrupt and fraudulent design, in the *November* vacation of the Supreme Court, in 1803, fraudulently caused a *test. fi. fa.* to be issued to the sheriff of the county of *Cayuga,* and delivered to a deputy of the sheriff, (*P. Hughes,*) without his knowledge. That the sale under the execution was entirely under the direction of the defendants, or one of them; and by artful and corrupt practices between them and the deputy sheriff, the latter, without the privity of the sheriff, sold to the defendant, or to some other person for their use, above *forty* military lots, of great value, and which had been levied on as the property of *Platner,* for *eleven dollars and twenty-eight cents.* That the execution was returned by the deputy, in the name of the sheriff, and without his privity; and the return mentioned the lands and tenements generally, without designating the lots. That the defendant *W.* then applied to the sheriff to execute a conveyance for the lots, which the sheriff refused to do; and the defendants took a deed from the deputy sheriff, which was fraudulently executed by him. That the defendants, in further prosecution of their corrupt and fraudulent design, in the *May* vacation of the Supreme Court in 1806, fraudulently caused another *test. fi. fa.* for the residue, to be issued to the sheriff of the county of *Onondaga.* That the sheriff sold to the defendants, or to some other person, for their use, and executed a deed for divers military lots, seized as the property of *Platner,* for *eighteen* dollars and fifty-two cents, and among which were the two lots above mentioned, belonging to the plaintiffs. That the sale was fraudulently conducted by the sheriff, who, in his return to the execution, speaks of levying on lands generally, without designating the lots sold. That the defendants, as assignees aforesaid, in further prosecution of their corrupt and fraudulent design, in *February* vacation of the Supreme Court in 1807, fraudulently issued

another *test. fi. fa.* to the sheriff of the county of *Seneca,* under which execution the sheriff sold to the defendants, or to some other person for their use, divers military lots of great value, seized as the property of *Platner,* for *twenty-five* dollars and forty cents; that the sale was corruptly conducted by the sheriff, who returned a levy on the lands generally, without designating the lots. That the defendants, under cover of their fraudulent deed, had taken possession of the two lots belonging to the plaintiff, by procuring an attornment from the person in possession. That the plaintiff was ignorant of the said judgment, or of any proceedings thereon, until he was so fraudulently dispossessed of the said lots. The plaintiff *prayed,* that the defendants might be decreed to quiet his title to the said lots, by executing to him a release of their pretended interest in the same; and be decreed to deliver up the possession thereof to the plaintiff. The plaintiff offered to pay the principal and interest of what the defendant gave for the lots, and the costs and charges of the execution and sale, if, in equity, the same could be demanded.

The defendant, *Samuel Sherwood,* in his answer, filed *December* 12th, 1812, admitted, that he had seen a deed on record from *H. Platner* to the plaintiff, for the two lots above mentioned. That he believed that *A. Bachman* obtained a judgment, as stated by the plaintiff. That he never knew or heard that the judgment was satisfied, in whole or in part, except so far as it was satisfied by executions issued under it. That while he acted as agent of *J. R. Van Rensselaer,* and superintended the sale in *Delaware* county, in 1803, *Stephen Hogeboom,* who attended that sale, suggested that the judgment was satisfied, but as his lands were sold under the execution, and he became a purchaser, the defendant *S.* placed no confidence in the suggestion. That *Jacob R. Van Rensselaer* always assured this defendant that the same was a just subsisting judgment, and in no wise satisfied or paid, except by the collections on the executions.

TROUP
v.
WOOD.

That the defendant knew nothing, nor has he heard of the bond or receipt said to be given by *Abraham Bachman* to *H. Platner*, nor does he believe any were ever given. The defendant admitted that *H. P.* was convicted, imprisoned, and pardoned, as charged; that the judgment was revived by the executors of *A. Bachman*, in 1799 or 1800, but he did not recollect whether he ever knew or heard of any other revival. He denied any knowledge or suspicion that the judgment was fraudulently revived. That a *test. fi. fa.* issued upon the judgment to the sheriff of *Ontario*, but what lands were sold the defendant did not know. That he believed the sum made upon such *test. fi. fa.* was 132*l.* 18*s.* (332 dollars 25 cents.) That he always believed that the execution issued, by direction of the plaintiff, to collect a just and subsisting debt. That he does not know whether the judgment was revived by the executors of *B.* before or after the execution to the sheriff of *Ontario*, though he always supposed it was before. That he never knew or heard of the refusal of the executor, *G. Monell*, or of the indemnity to him. That he had understood from *J. R. V. R.* that the judgment was assigned by the executors of *B.* to him, on the 4th of *December*, 1802, and that he then allowed on his accounts, and paid them, in cash, 275*l.* 15*s.* 10*d.* (689 dollars and 48 cents,) being the balance then due upon the judgment; and that the transaction was fair, without any knowledge or just ground to suspect that the judgment was satisfied. That in *October* vacation, 1802, a *test. fi. fa.* for the residue, was sent to the sheriff of *Delaware*, and the indorsement on the execution was to levy 275*l.* 15*s.* 10*d.* with interest on 248*l.* 14*s.* 2*d.* That the defendant was constituted by *J. R. V. R.* his *agent*, with written directions to attend the sale, and without any interest therein. That the sheriff was directed to sell the right of *H. P.* to lots No. 10. 20. and 40. in *Whitesborough* patent, in *Delhi*, (except such parts thereof as were possessed by *Levi Baxter*, *William Reside*, *Joseph Denio*, and *George Fisher*, who were then ac-

+ was

tual settlers thereon,) with a view that the execution should be satisfied, by the sale of wild lands in the hands of those who had purchased for speculation. That the settlers not being apprized of this direction, or not assenting to it, agreed with *Stephen Hogeboom*, the owner of the wild land, that they and he were to pay their proportions of the execution, according to the number of acres each held, or of the amount of sales, if it did not satisfy the execution. That the sale was duly advertised, and held at the court house, on the 16th of *April*, 1803. That the sale was proceeding when the defendant entered the room, the property of *Hogeboom* being up. That the sheriff agreed to delay the sale a few minutes, and propositions were made to the defendant, (then the agent of *J. R. V. R.*, and in no other manner interested,) for some terms, better than immediately paying the execution, as some of them had not in hand the necessary amount of money. That the defendant said, he had no authority to consent to any accommodation as it respected *Hogeboom's* land, but was authorized to accommodate the settlers. That the interval of the sheriff's delay lasted twenty minutes, during which time it was agreed between the defendant and the settlers, (excluding *Hogeboom*,) that instead of paying up the execution and discharging the judgment, they might become purchasers of it, and take an assignment, so that if any property of *H. P.* could afterwards be discovered, they might be reimbursed. That the settlers then took the direction of the sale, and the sale of *Hogeboom's* land was continued, and was struck off to him, under the previous agreement between him and the settlers, for the amount supposed to be his proportion. That the settlers, understanding that a sale under this judgment would protect their lands under younger judgments, chose to have their lots sold, and they were sold, and each owner became a purchaser. The lands of the four settlers named, amounted to 684 acres, and the land of *Hogeboom* was 856 acres, and the amount due on the execution, including sheriff's fees,

was 706 dollars and 62 cents. That in pursuance of his agreement with the settlers, he, as agent, received of the sheriff and of the settlers, 695 dollars and 51 cents in cash, or a note equal thereto. That he detailed the transaction to *J. R. V. R.* and requested an assignment of the judgment to *Levi Baxter*, for the benefit of the settlers. That 695 dollars and 51 cents was the amount of the execution, with interest up to the day of sale. That the amount for which the judgment was to be assigned was 292 dollars and 70 cents. That *J. R. V. R.* assigned the judgment to *Levi Baxter*, the 3d of *June*, 1803, in consideration of 287 dollars and 77 cents, unt'l which time the defendant had no interest in the business, except as agent. That the sheriff executed deeds to the purchasers, and he probably drew them. That the lands so sold would, at that period, if uncultivated, have been worth from three to eight dollars an acre. That the defendant supposed the reason why the lands were not bid higher was, that no person present was disposed to make the settlers pay more than they were obliged to, or to reduce the balance, which by their purchase of the judgment they might obtain from the property of *H. P.* That he thinks it probable the sheriff returned on the execution that he had levied 402 dollars and 80 cents, as that was the sum made by him on the sales, besides his fees. That soon after the assignment of the judgment, the four settlers named called on the defendant to make arrangement to collect the balance due on the execution out of the property of *H. P.* That it was agreed between them and the defendant, that he should become their agent, in collecting the balance, for a reasonable compensation. That the defendant commenced an inquiry, and ascertained that *H. P.* owned military titles, and he suggested that it would be best for them to purchase in the title of *H. P.*, supposed to be precarious, and by risking the title of several lots, they might get some good ones. That objections were made, and it was finally agreed between *Baxter* and the defendant, that they would hazard

that risk, and the other defendants agreed to accept whatever was made out of the sales upon the execution, according to their shares. That this defendant then proposed to the defendant *W.* that if he would engage in the risk, and attend to the sales, any purchases made under the same should accrue to the benefit of him and the defendant, and *Levi B.*, in equal shares. That the defendant *W.* agreed, and the defendant then caused a *test. fi. fa.* to be issued to the sheriff of *Cayuga*, on the 20th of *December*, 1803, and sent it to the defendant *W.* That the defendant *W.* informed him that a sale was advertised for the 5th of *March*, 1804. That this defendant attended the sale. That he had no interest in the judgment in contemplation, when the assignment was made to *L. Baxter*, and that the assignment was made solely with a view to collect the balance out of the property of *H. P.* That the execution was not delivered to a deputy of the sheriff of *Cayuga*, with a design to conceal it from the sheriff. That the sale in *Cayuga* was in a tavern, in *Scipio*. That a number of persons were present, of whom the defendant named four. That several persons bid. That some lot or lots were struck off to *Joshua Patrick*, to *Benjamin Tucker*, and *Eleazar Burnham*, and all or the greater part of the remainder to the defendant *W.* That the lots were set up separately, and the persons present seemed to suppose *Platner's* title spurious, and were not willing to bid. That the lot struck off to *Ebenezer Burnham* was intended for the defendant *W.*, this defendant, and *Levi B.* That a deed was drawn by the defendant, and executed the next day, by the deputy, in the name of the sheriff. That twenty-five lots, lying in twelve different towns, (the number of each lot, and the towns, being mentioned,) were sold for ten dollars and one cent. That nothing was said, at the time of the sale, touching the judgment, or the amount due upon it. That he drew, for the deputy, the return on the execution. That the defendant, on his return home, informed the proprie-

tors of the assignment, of what had been done, and offered then to take his share of the purchase, and they to allow him for his trouble and expense, which they declined. That the defendant then bought out their respective shares, and allowed them the principal and interest of them respectively. That on the 21st of *October*, 1812, he bought in the share of *Levi Baxter*, so that he is now sole owner of the balance due on the judgment. That a *test. fi. fa.* for the residue, was issued to the sheriff of *Onondaga*, and this defendant, and the defendant *W.* attended the sale, on the 15th of *October*, 1806. A number of persons were present. The deputy sheriff sold the right of *H. P.* to twenty-two lots in eleven towns, (all mentioned,) and they were purchased for the benefit of the defendant, and the defendant *W.*, and *Levi Baxter*. Each lot was sold separately, and no lot brought more than three or four dollars. Nothing was said, at the time of the sale, relative to the judgment, or the amount due thereon. That the sale was fair and legal. That the defendant drew the return to the execution, and the deputy sheriff executed a deed. The two lots of the plaintiff were included in the sale or the deed. That in *February* vacation, 1807, a *test. fi. fa.* for the residue, was issued to the sheriff of *Seneca*, and a sale took place, and the defendant *W.*, and *Levi Baxter*, were present, and a number of lots (eleven) were sold for the benefit of themselves and this defendant, and all the proceedings were fair and legal. That in *October*, 1807, the defendant *W.* took possession of the two lots of the plaintiff, under claim of title, and has exercised acts of ownership ever since. That the defendant does not claim title to the two lots of the plaintiff, under the deed of the sheriff aforesaid, or in pursuance of the sale, in *May* vacation, 1806. That he claims title to the said lots by virtue of a sale, by the sheriff of *Onondaga*, under the said judgment in *May* vacation, 1807, to the three associates, and by virtue of a release from the defendant *W.*

and *Levi B.*, on the 30th of *September*, 1812, of all their right and title. The defendant admitted he received a let- ter from the plaintiff, dated the 7th of *December*, 1811, de- manding a release of his claim to the two lots of the plain- tiff, and that the defendant did not answer the letter. That if the plaintiff will bring an ejectment, the defendant will stipulate not to introduce, in his defence, any title whatso- ever, derived under the said judgment. That this sugges- tion is not made, because the defendant is apprehensive that a title derived under the said judgment is not good; but be- cause he is satisfied that the plaintiff never had any title to the two lots he claims.

The answer of the defendant *Walter Wood*, filed the 30th of *November*, 1812, stated that he did not believe that the plaintiff was ever seized of the two lots. He admitted his purchase of *H. P.*, as stated, and the judgment of *Abra- ham B.* He said that he knew nothing of any satisfaction of the judgment, except by the executions and sales, and be- lieved it to have been a good and subsisting judgment. That he did not believe any such receipt existed, as stated in the bill; and that he understood the executors of *B.* revived the judgment. He did not believe that it was fraudulently re- vived. That he knew nothing of the *Ontario* execution. That he believed the judgment was assigned to *Jacob R. Van Rensselaer*, for a fair and valuable consideration. That he knew nothing of the *Delaware* execution. That in 1807, the defendant *S.* informed him of the judgment, and that it was assigned to *Levi B.*, and that there was a *balance*. which the defendant *S.*, and *Levi B.*, wished to collect, and proposed, if the defendant would engage in the risk of eventu- ally obtaining title, that the purchases should be for the joint benefit of the three, and he agreed to the proposal; and a *test. fi. fa.* was issued to the sheriff of *Cayuga.* That he be- lieved the balance appearing was justly due, and he delivered the execution to the deputy sheriff in *Scipio.* That the ex- ecution contained an indorsement, to levy 292 dollars 70

cents, and interest. That there was no design of secresy in the defendant, and that he believed all was fair. That he searched the clerk's office, and believed that many of the *Platner* lots were worth attention, and might " become beneficial to themselves." That his hopes have been, in a degree, realized. That the sheriff's sale was on the 5th of *March,* 1804, and duly advertised, and the lots, (naming them,) were sold separately, and bid off for the benefit of the three associates. That a number of persons attended, besides the two defendants. That no conversation was had, as he recollects, at the sale, relative to the judgment or the monies due. That the deed was executed by the deputy, on the day of the sale, to the three associates. That the sheriff (*Hughes*) did execute a deed to *Benjamin Tucker,* for lands purchased at such sale. That an execution on the judgment was issued to the sheriff of *Onondaga,* on which he was directed to levy 281 dollars 42 cents, and interest ; and a sale was duly advertised, and took place on the 15th of *October,* 1806. That a number of persons were present. That the plaintiff *S.,* and *Levi B.* were also present. That the sale was by the deputy sheriff, and a number of lots were sold, (naming them,) separately. The deed was executed, on the same day, by the deputy, to the three associates. That a lot sold for above four dollars. That the persons present were deterred from buying, from an opinion that *Platner's* title was bad. He recollected no conversation, at the sale, relative to the judgment, or the amount due. That he believed every thing was fair and legal. That the two lots of the plaintiff were not sold. That a *test. fi. fa.,* for the residue, then issued to the sheriff of *Seneca,* in *February* vacation, 1807, and a sale was made on the 25th of *May,* 1807, and eleven lots, lying in five towns, (naming them,) were sold, and bid off by the defendant, and *Levi B.,* and a deed was given by the sheriff to the three associates. That several persons attended the sale, and bid. The price of all the lots was twenty-eight dollars. That soon after this last sale, *Benjamin Tucker* in-

timated that the judgment had been paid and satisfied. That he did not believe in the suggestion. That in *October*, 1807, he took possession of the two lots of the plaintiff, and continued in possession to the 30th of *September*, 1812, and exercised ownership, and then sold them to the defendant *S.* and received an indemnity. The defendant admitted that he received a letter from the plaintiff, in *December*, 1811, requiring a release, and that he did not answer the letter. He admitted that he gave the agent of the plaintiff a memorandum, stating, among other things, that on the 7th of *September*, 1807, the sheriff of *Onondaga* sold to the three associates, the two lots of the plaintiff aforesaid. That these two lots, with others, were purchased at the sheriff's sale, under the said judgment, on the 7th of *September*, 1807.

1820.

TROUP
v.
WOOD.

Replications having been filed to these answers, numerous witnesses were examined, and much evidence given on both sides; but the material parts of it being noticed by the Chancellor, in his opinion, it is unnecessary to detail it here.

The cause was argued by *Henry* and *Van Buren*, for the plaintiff; and by *Van Vechten* and *E. Williams*, for the defendants.

*Nov.* 10th and 12th, 1819.

The cause stood over for consideration to this day.

*Jan.* 4th,1820.

THE CHANCELLOR. The prayer of the bill is, that the plaintiff be quieted in his title to two military lots, which the defendants caused to be sold under a dormant judgment, against *Henry Platner*. The charge is, that the judgment was satisfied long before the sale, and that it was kept on foot by fraud, and made subservient to a scheme of fraudulent speculation on the part of the defendants.

1820.

TROUP
v.
WOOD.

The judgment was entered up in 1787. The sale of the two lots claimed by the plaintiff, was in 1807, and was the last and closing act of a series of transactions, in which real property, lying in five different counties, estimated at upwards of 134,000 dollars, at the time of the sales, and upwards of 409,000 dollars at the time of taking the testimony, was sold for less than 800 dollars, to satisfy a judgment originally for a debt of less than 1,000 dollars, and which had been avowedly reduced considerably below the original sum when the first execution issued.

It is contended, on the part of the plaintiff, that there are several periods in the history of the case, at each of which the acts that occurred amounted to a satisfaction and discharge of the judgment, and that every subsequent step which was taken, was an act of premeditated fraud.

1. It is said, that the judgment was satisfied by a settlement between *Bachman* and *Platner*, the original parties, in *August*, 1798.

The judgment of *B.* against *P.* was satisfied by the settlement between the parties in *August*, 1798.

*Henry Platner* was examined, being made a competent witness by a release from the plaintiff. He says, that there had been various dealings between him and *Bachman*, who was a merchant, and a neighbour of his, between the date of the judgment and 1797, when they came to a partial settlement. That in *August*, 1798, they came to a final settlement, and there was a considerable balance due *Platner*. That *Bachman* then gave him a receipt in full, as well of the judgment as of all other accounts and demands. That as *Bachman* was then bail for *Platner*, and wished some indemnity, it was agreed that the balance, being above 400 dollars, found due to *Platner*, should remain unsatisfied. *Charles Vincent*, son-in-law of *Platner*, another witness, who was present at the partial settlement in 1797, and kept several receipts in his possession belonging to *Platner*, testifies, that in *August*, 1798, *Platner* gave him the receipt in full above mentioned, and a few days thereafter he saw *Bachman* and *Platner* together, and the receipt in full of the

judgment, was admitted by *Bachman.* That at that time Bachman suggested, that he still might want the judgment to cover him as a security for being bail for *Platner.*

These two witnesses thus prove, that the judgment was satisfied, by the act and acknowledgment of the parties, in *August,* 1798. They concur as to the circumstances attending the partial settlement the year before, and from them it would appear, that though the balance on the judgment was 252 pounds, yet that *Bachman* assumed or acknowledged several debts which would, when adjusted, leave a considerable balance in favour of *Platner,* and the adjustment of these debts in 1798, left the balance, already mentioned, in favour of *Platner.*

If this receipt in full had been produced, it would have silenced this controversy, in the first instance, but the non-production of it is accounted for in the following manner :

*Platner* admits that he gave his receipts, which were produced at the partial settlement, to *Vincent* to keep, but he thinks the receipt in full was retained in his own possession, and he does not account for the loss of it. But *Vincent* says, *Platner* gave it to him to keep; and this is the more probable account, as *Vincent* had been the depositary of the former receipts. He says, that *Bachman* repeatedly urged him to surrender up that and the other receipts to him, as he wanted to use the judgment as his indemnity for becoming bail for *Platner.* It is to be observed, that *Platner* was about this period overwhelmed with misery and ruin, being early in *June,* 1799, convicted of forgery, and sentenced to imprisonment in the state prison for life, where he continued, until pardoned in 1806. This will very easily account for the dispersion of his papers; and this calamity afforded facility and temptation to the plunder of his estate. *Vincent* says, that *Bachman* became so importunate, that in *June,* 1799, (being the very time of the conviction of *Platner,*) he delivered the receipts to *John Shafer,* and requested him to take and preserve copies, which he did ; and in *Septem-*

ber, 1799, he surrendered up all the originals to *Bachman*, who died a few weeks afterwards.

*Platner* and *Vincent* were both of them, at the period of 1799, men of bad credit. The former has, however, considerably regained the forfeited esteem of his acquaintance; and the intrinsic probability and apparent candour of their story, is corroborated by facts derived from other and unquestionable sources.

*Shafer* confirms the fact of having the original receipts delivered to him by *Vincent*, and one of them purported to be a receipt in full from *Bachman* to *Platner*, as well of the judgment as of all demands. He says, *Vincent* wished him to keep the originals, but owing to the conviction of *Platner*, he was afraid of difficulty, and refused, and only consented to keep copies, which he took, and then returned the originals to *Vincent*. He says, he had seen the handwriting of *Bachman*, and he believed the receipts to be genuine. The copies he took were called out of his hands by *Vincent* in September, 1799, about three months after they had been taken; and *Vincent* says, this was done at the solicitation of *Bachman*, who required the possession of them. The character of *Shafer* is not impeached. *Abraham Vincent*, a brother of *Charles Vincent*, and who lived with him in the spring of 1799, says, he saw in his possession a receipt, purporting to be given by *Bachman* to *Platner*, in full of the judgment, and of all demands. That he was well acquainted with the handwriting of *Bachman*, and knew the signature to be his. He read it, and recollected the contents of it distinctly.

When the copies of the receipts were returned to *Vincent*, *Shafer* took a receipt in these words : " Received of Major *John Shafer*, a copy of sundry receipts of *Abraham Bachman* to *Henry Platner*, Sept. 10, 1799." This receipt is proved as an exhibit in the cause, and it gives peculiar force to the other testimony.

Other proof, in corroboration of the satisfaction of the judgment, is derived from the testimony of Ch. J. *Spencer.* He states that he recovered a judgment against *Henry Platner*, in *April*, 1797, and believing this old judgment of *Bachman* was satisfied, or kept on foot by fraud, to protect *Platner* from creditors, (for *Bachman* and *Platner* were connected by marriage, and intimate) he applied to *Bachman*, and demanded as a matter of right, that he should release his lien under that judgment, to the lands of *Platner*, to the value of 5,000 dollars, in *Claverack*, where *Platner* and *Bachman* resided. That *Bachman* gave the release without hesitation, and without consideration. The release is an exhibit, and is dated in *October*, 1797. He believed that *Bachman*, by that release, devested himself of all expectation of obtaining any satisfaction under the judgment; and that act of *Bachman* confirmed him in the belief that the judgment was satisfied, or fraudulent.

This fact is in corroboration of the testimony of *Platner* and *Vincent*, that the partial settlement in 1797, showed that *Platner* could not eventually be the debtor.

It is proved by *Henry Avery*, that he found among the papers of *Bachman*, after his death, several receipts given by him to *Platner*, and which are exhibits in the cause. How came *Bachman* by these receipts, unless, upon a final settlement, the parties considered their dealings and demands as closed, or unless *Bachman* repossessed himself of all the vouchers he had given, in the manner stated by *Vincent?* *Platner* was, at that time, deemed dead in law, and forever separated from all the business or pecuniary concerns of this life.

*Jacob F. Miller* was present at the partial settlement in 1797, and he is said to have witnessed the receipt in full in 1798. He was one of the executors of *Bachman*, who revived the judgment, and gave it credit, as being valid and subsisting. He died in 1804, and we are deprived of any explanation which he might have given to the mystery of

this transaction. *Vincent* admits, that after the death of *Bachman*, he was induced, by an offer of some of the property of *Platner*, to agree with *Miller* not to disclose his knowledge of the satisfaction of the judgment; and he says, that *Miller* showed him a bundle of papers of his testator, *Bachman*, and that among them was a full statement of the final settlement between *Bachman* and *Platner*, and upon which there appeared to be a considerable balance due to *Platner*. These papers he saw *Miller* destroy.

There is another exhibit in the cause, which is an *item* of some influence on this point. *Bachman*, on the 17th of *August*, 1798, gave a receipt to *Platner*, of a bond from *Joseph Denio* to *Platner*, on which was a considerable balance, which he promised, when collected, to pay in goods to two of the daughters of *Platner*; and *Platner* says, that on the final settlement, he deposited such a bond with *Bachman* for the benefit of two of his daughters.

Here, then, is the evidence in favour of a satisfaction of the judgment in *August*, 1798. We have four witnesses who all testify to the existence of a receipt in full of the judgment given by *Bachman*, and one of them satisfactorily accounts for its loss. In corroboration of the testimony of these witnesses, we have another fact, which shows, that *Bachman* could not, as early as *October*, 1797, have regarded the judgment as a valid, subsisting debt. We find, also, that he was in possession, and died in possession, of other receipts, which he had before given to *Platner*, and at the time of the final settlement, in *August*, 1798, he takes a bond due to *Platner*, to collect, as agent of *Platner*, and to appropriate the proceeds according to his direction. This mass of positive and circumstantial testimony satisfies me, that the judgment was settled and discharged in *August*, 1798; and if there was any understanding or arrangement between *Bachman* and *Platner*, that the judgment should remain as a security or means of indemnity to *Bachman*, for becoming bail to *Platner*, such an arrangement was, in judg-

ment of law, null and void. It is a sound and settled rule, that the penalty of a bond cannot be made to cover any other debt or demand than that specified in the condition. It would, as the Supreme Court observed, in *Bergen* v. *Boerum*, (2 *Caines*, 256.) be " against the very form of the contract, and liable to great abuse. It would be a deception on the world, for the condition, which is to discharge the judgment, is on record. If, therefore, it was to reach other demands, it would be impossible to know what would satisfy the debt." There could not be a more dangerous, and there is certainly not a more inadmissible pretension, than that the parties to a judgment may keep it on foot, after the original debt has been paid, to meet and cover new and distinct engagements between them. But the parties have never acted upon any such agreement, for the executors of *Bachman* have only claimed what they assumed to be the balance on the judgment.

If the judgment was satisfied in 1798, it must have been fraudulently revived by *Miller*, the responsible and acting executor of *Bachman ;* and whatever validity may be attached to *bona fide* purchases by third persons, under executions issued upon the revival of the judgment, yet the owners of the judgment ought not to be permitted to derive any benefit from such sales, and every assignee of the judgment took it, and made purchases under it, at his peril.

2. If, however, there was a balance due upon the judgment, at the time of the conviction of *Platner*, the judgment was not revived in 1800, either with the formalities required by law, or with the notice that justice and equity required.

*Platner* was convicted of a felony in *June*, 1799, and sentenced to imprisonment in the state prison, at hard labour, for life. The act of the 29th of *March*, 1799, declared, that all such convicts for any felony *thereafter* to be committed, should be deemed to be civilly dead, to all intents

---

*scire facias* issued to such convict in prison, and not to his legal representatives, or terre-tenants, to revive a judgment, and two *nihils* returned thereon, can have no legal effect or operation.

1820.

TROUP
v.
WOOD.

The penalty of a bond cannot be made to cover any other debt or demand than that mentioned in the condition.

Nor can a judgment after the original debt has been fully paid, be kept on foot to cover new and distinct engagements between the parties.

It seems, that a person convicted of felony and sentenced to imprisonment for life in the state prison, is *civiliter mortuus*.

And, therefore, writs of

1820.

TROUP
v.
WOOD.

and purposes. The record of *Platner's* conviction is not produced, or cannot be found, and we do not know, therefore, with absolute certainty, whether the forgery of which *Platner* was convicted, was committed before or after the 29th of *March* preceding. The presumption is as fair, that it was committed after as before that period; and every presumption, in a case so extraordinary as this, ought to be turned against the party who has so abused the process of the law. But I apprehend, that the act of *March*, 1799, was only declaratory of the existing law, and enacted for greater caution. Lord *Coke* says, (*Co. Litt.* 130. *a.* 133. *a.*) that every person attainted of felony, or who is banished for life, or having committed felony, abjures the realm, is *extra legem positus*, and is accounted in law, *civiliter mortuus*. *Christian*, in his notes to 1 *Bl. Com.* 133. says, that if a person be convicted of treason or felony, and saving his life, is banished forever, this is a civil death; and so it is, also, if he receives sentence of death, and afterwards leaves the kingdom for life, upon a conditional pardon. When the new criminal code was enacted in *March*, 1796, changing the punishment of forgery from death into imprisonment for life, the legal consequences of the conviction, as to disability, must have remained the same. The party was incapacitated, forever, from discharging any of the civil relations, equally as if transported, or banished for life, or outlawed, or as if he had abjured the realm, or become a monk professed.(*a*) He was equally within the reason of the rule, declaring a party convicted of felony civilly dead. And we perceive, that the Legislature, in 1796, when they changed the punishment from death to imprisonment for life, seemed to be aware that the other common law consequences of the conviction would still follow, for they declared, by express provision, that no such conviction should work a forfeiture of property, real or personal.

(*a*) Vide *Matter of Deming*, 10 *Johns. Rep.* 232 ; and *Loflin* v. *Fowler*, 18 *Johns. Rep.* 335.

If this conclusion be correct, the *scire facias* which was directed to *Platner*, and to him only, ought to have been awarded to his representatives and to the terre-tenants. Two *nihils* returned upon a *scire facias*, awarded against a party then under the execution of a sentence of imprisonment in the state prison for life, was a useless act, and of no force in law. And it affords a very unfavourable specimen of the spirit with which the judgment was revived by the representatives of *Bachman*, (one of whom, if the testimony is to be believed, was a witness to the final discharge of the judgment in 1798,) that no effort was made to give personal notice of the proceeding, to any one representative of *Platner*, or to any terre-tenant or purchaser holding under him the property sought to be charged. It wears very much the complexion of a fraud.

3. But, admitting the judgment was not satisfied before the death of *Bachman*, and was duly revived, it is next contended, that it was satisfied by the sales made in *Ontario*, under an execution issued at the instance of the executors of *Bachman*, and in *Delaware*, under an execution issued at the instance of *J. R. Van Rensselaer*, the assignee of the judgment.

According to a statement of the book account, and the balance due on the judgment, made out to the 17th of *April*, 1798, and which was taken from the papers of the estate of *Bachman*, the balance due to *Bachman*, at that time, on the judgment and book account, and other demands taken together, amounted to 252*l*. 3*s*. 10*d*. This was the statement and balance shown to *Jacob R. Van Rensselaer*, the first assignee of the judgment by *Miller*, the executor, as coming from the estate of *Bachman*; and *E. Gilbert*, the attorney of *Bachman's* executors, in respect to the revival of the judgment, states, in a letter to *Van Rensselaer*, (and which is an exhibit in the cause,) that *Miller*, the executor of *Bachman*, presented to him

that sum, as being the balance claimed upon the judg-ment, in *April*, 1798. If we take that sum as the basis of calculation, (and the defendants do not pretend to any greater sum as being due at that period,) there was, after allowing interest on that balance, and after cre-diting the sum of 332 dollars 25 cents, raised by the sales in *Ontario* county, due to the estate of *Bachman*, on the 16th of *April*, 1803, (the day of the *Delaware* sales,) the sum of 464 dollars, and no more. The costs of entering up the judgment, in 1787, ought, probably, to be considered as having been included in the accounts and settlements be-tween the parties; and that the 252*l.* 3*s.* 10*d.* was the *whole* demand that existed, at that time, against *Platner.* The judgment had been entered up eleven years before, and by an attorney, *Richard Sill*, who, as it is notorious, had been dead some years prior to the time that the balance was as-certained, in 1798. It is probable the costs of entering up that judgment had been paid by one of the parties to the at-torney, and were included in the charge of book account. The balance, in 1798, was made up not only of the judg-ment debt, as one of the items, but of other debts and de-mands, and particularly of a large book debt on each side. After such a settlement of various accounts and demands, and including the judgment debt, it is not to be presumed that the costs of the dormant judgment were omitted, and the representatives of *Bachman*, who exhibited the balance upon that settlement, as the amount of their demand, ought to be precluded from claiming any sum beyond it. The presumption is, (and they ought to be concluded by it until it is destroyed by direct proof to the contrary,) that the costs of the judgment had been previously settled between the parties. Nor were any costs legally chargeable to the estate of *Platner*, upon the revival of the judgment by *scire facias*, for the judgment under that process, passed by de-fault, without plea, and no costs were taxed or inserted in the *scire facias* record.

We may then safely conclude, that at the time of the *Delaware* sales, there could not have been more than 464 dollars due on the judgment. If we credit the 402 dollars 81 cents, being the acknowledged amount of sales in *Delaware*, there remained only a balance of 61 dollars 19 cents, unsatisfied, *when the defendants became interested in the judgment*, and sent executions, for the purpose of speculation, into several of the western counties of this state! Even, if we were to add to the balance so remaining unsatisfied, the costs of entering up the judgment, it would be only an addition to that balance of 17 dollars 34 cents.

*Van Rensselaer* purchased the judgment of *Miller*, one of the executors of *Bachman* on the 4th of *December*, 1802, for 206*l*. 3*s*. 11*d*. and he states that *Miller* claimed that sum, as being the balance due on the judgment, on the 14th of *November*, 1801. Upon what *data* such an estimate could have been made, does not appear; and we know that it could not have been correct, for the balance admitted by *Miller* to be due in *April*, 1798, with interest, and after deducting the *Ontario* sales, fell far short of that sum. *Van Rensselaer*, who had now become proprietor of the judgment, had already issued his execution to the sheriff of *Delaware*, by whom it was received on the 13th of *November*, 1802, and he added to the 206*l*. 3*s*. 11*d*. his own private demands against *Platner*, and thereby made the sum for which execution issued to be 275*l*. 15*s*. 10*d*. This addition to the execution was utterly unwarrantable; and to show in how loose and careless a manner the property of *Platner* was pursued, it is worthy of notice, that the *test. fi. fa.* issued in 1800, to the sheriff of *Ontario*, (as appears from the exhibit of the writ and its indorsements,) contained a direction, not only in the body of it, but by indorsement in the name of the attorney, to collect 772*l*. 8*s*. 8*d*. (the penalty of the bond,) besides costs and sheriff's fees. We have no evidence that the judgment had ever been even revived when this execution issued in the name of *E. Gilbert*, as attorney.

1820.

TROUP
v.
WOOD.

But, if the 402 dollars 81 cents, raised upon the *Delaware* sales, did not entirely extinguish the judgment, there were circumstances attending those sales which must be admitted to have produced that effect.

The defendant *S.* says that he attended the *Delaware* sales, as agent for *Van Rensselaer*, the assignee of the judgment, and that the sales were at the court house on the 16th of *April*, 1803. That when the sheriff was commencing the sales, he entered, on behalf of *Van Rensselaer*, into an agreement with certain persons, who were settled upon lots advertised and set up for sale, by which, instead of paying up the execution, they might become purchasers of it, and take an assignment of the judgment, and, under it, pursue other property of *Platner*, that might afterwards be discovered. That the claimant of one tract of land was not included in this agreement, and he accordingly bid off that land for a sum which was, by a previous agreement between him and the settlers, deemed to be his proportion of the burden of the execution. The other persons bid only nominal sums, and took the direction of the sale, and received a title from the sheriff under the judgment. The real sum bid by one of those persons, and the nominal sums bid by the others, produced the sum already mentioned of 402 dollars 81 cents; this sum was produced upon a sale of lands proved to have been worth, at that time, upwards of 16,000 dollars, and, at the time the testimony was taken, upwards of 43,000 dollars. This arrangement left a balance remaining due upon the execution, according to the sum for which it was issued, of 292 dollars 70 cents, and that sum was to be considered as the price which the settlers were to pay for the purchase and assignment of the judgment. This agreement was ratified and carried into effect by *Van Rensselaer*; and in *June* following, the judgment was assigned to *Levi Baxter*, one of the parties to the agreement, for and on behalf of himself and the associates.

*Erastus Root*, a witness present at the sale, says, that the defendant *S.* dissuaded bystanders from bidding, and pro-- posed that the persons interested in the lots should not bid to the amount of their relative proportions of the judgment, but that they should *leave a balance due on the execution*, to be sent into the western part of the state to be satisfied, and by which the parties were to be indemnified. That a certain sum had been agreed to be left as a balance to remain due on the execution, to be sent to the westward, and the means used to prevent others bidding at the sale, arose from the arrangement made between the defendant *S.* and the settlers.

There is no essential difference between the answer of the defendant, and the testimony of the witness, in respect to the arrangement of the sale, except that the latter describes the intention of it, and the baneful effects of it, in more clear and explicit terms. The defendant says, he acted throughout the sale, as the agent of *Van Rensselaer*, and had then no interest in the judgment or sale; and it was not until the settlers had received an assignment of the judgment, that he entered into an arrangement with them to share the risk and profits of a speculating excursion with an execution into the western countries. He says, the settlers first applied to him to be their agent, to collect the balance, for a reasonable re-- ward; and that having ascertained that *Platner* owned mi-- litary titles, it was finally agreed that he should come in as a copartner in the concern, and share in the risk of acquiring some good titles to military lots. It was then that the de- fendant *S.* applied to the defendant *W.*, who resided in *Ca- yuga* county, and made a proposition to him, that if he would engage in the risk, and attend to the sales, purchases made under the same should enure to his benefit in equal propor- tion with the others ; and to this proposition, the defendant *W.* says, he assented.

According to the testimony of *Root*, the defendant *S.* must have had an eye to the speculation, at the time of the sale,

1820.

Troup
v.
Wood.

An agreement by the owner of an execution, with certain persons, to prevent the usual competition at a sheriff's sale, and in order to leave a small balance on the execution, for the purpose of seizing other property of the debtor, is fraudulent: and the execution is deemed, in law, to be satisfied, there having been lands seized on the execution, amounting in value to a far greater sum than the debt, and which, in consequence of such fraudulent agreement, sold for mere nominal prices.

for if he had remained only a disinterested agent of the owner of the execution, he would not have taken any part or interest in the arrangement between the settlers, but would have left them to satisfy the execution out of the immense property then under its power, by some equitable apportionment of it among themselves.

The question now occurs, is the owner of an execution to be permitted to enter into an agreement by which a fair sale under the usual competition is to be suppressed, and property, to more than thirty times the amount of the execution, sold for a nominal sum, in order to leave a balance to feed the execution, and enable it to sweep away property to an unmeasurable extent, in other counties? Such an agreement is against the policy of the law, dangerous to the rights of property, and fraudulent in its design. The creditor who suffers an execution, which the law lent him for his security, to be perverted to such a purpose, ought to be deprived of any further use of it. It is satisfied and cancelled by the force of such an act. This must be the necessary conclusion of law. It would be a violation of all principle, and a reproach to the administration of justice, to consider a small balance preserved under such circumstances, and for such uses, as a subsisting debt. As was truly observed, in the case of *Jones* v. *Caswell*, (3 *Johns. Cas.* 29.) " the law has regulated sales on execution with a jealous care, and provided a course of proceeding likely to promote a fair competition. A combination to prevent such competition, is contrary to morality and sound policy. It operates as a fraud upon the debtor, and his remaining creditors, by depriving the former of the opportunity of obtaining a full equivalent for the property which is devoted to the payment of his debts, and opens a door for oppressive speculation." By the interference and act of the owner of the execution, and by a combination between him and third persons, the property of *Platner* chargeable with the execution, is sold for nominal prices, and for the very purpose of pursuing and

sacrificing other property.  This conduct ought to be deem- ed and adjudged a satisfaction of the execution.  The sheriff seized sufficient property, and if it had been wasted or fraudulently sacrificed by the sheriff, the plaintiff would have had his remedy against him.  When sufficient goods are seized by execution, the party can have no further re- medy against the defendant, who is discharged by an ade- quate seizure.  He must look to the sheriff.  This is the just principle of law, which will not subject the defendant's property to satisfy the execution a second time.  (*Clerk* v. *Withers*, 1 *Salk.* 322.  2 Ld. *Raym.* 1072.)  Here it was not the sheriff, but it was the plaintiff himself, by his agent, who agreed that the property on which the execution was levied, should be sold for a nominal sum.  Can it be possible that the plaintiff, or those who come in under him with know- ledge of all these circumstances, shall be permitted to travel into other counties, and to hunt up other property with the execution ?  It is rarely that we meet with a more flagrant attempt at speculation under the forms of law.  It was the pursuit of the property of a helpless and imprisoned convict, who had left his family in shame and misery.  The plunder of the shipwrecked property of such a victim, was a hard and unconscientious act, which can never receive any coun- tenance from this court.

The execution was, accordingly, satisfied and discharged, by the sales in *Delaware*.

4. But assuming that there did remain a balance, after these *Delaware* sales, from sixty to eighty dollars, legally due on the judgment, we are then to examine the conduct of the defendants at the *Cayuga* sales.  They had now become the principal owners of the residuum of the debt, small in- deed in amount, but mighty in mischief; and the *Cayuga* sales were under their special and immediate direction.

The defendant S. says, that an execution to the sheriff of *Cayuga* was sent by him to the defendant *W.*, in *December*, 1803, and the property of *Platner* advertised for sale on the

<div style="margin">

1820.

TROUP
v.
WOOD.

Where the sheriff seizes sufficient pro- perty of the debtor under an execution, the debtor is discharged from the judg- ment, and the plaintiff must look to the she- riff for his mo- ney.

Sales by the sheriff of *Ca- yuga*, under the execution, fraudulent and void.

</div>

5th of *March*, 1804. The sale was held at a tavern in the town of *Scipio*, and the defendant *S.* attended in person from the county of *Delaware*, a distance, as travelled, of upwards of 100 miles. As he had already engaged the defendant *W.*, who resided on the spot, to attend the sales, such a journey, at such a season of the year, and when the sum remaining due, according to his own calculation, was only 110 dollars, is pretty good evidence that the real object of the sale was not the debt, but speculation. It is evidence, also, of the ardour and vigour with which that object was pursued.

At that sale, according to the answer of *S.*, some few persons (of whom he mentions four) attended, but the persons present seemed to suppose *Platner's* title spurious, and were unwilling to bid. He says, that nothing was said, at the time of the sale, touching the judgment, or the amount due upon it; and twenty-five military lots, lying in twelve different towns, were separately sold, for the aggregate sum of *ten dollars and one cent!* On the day following, the deputy sheriff who attended, executed a deed to the defendant *W.*, who purchased for the benefit of the defendants, and the four settlers in *Delaware* who were interested in the assignment of the judgment. After this sale, the defendant *S.* purchased in their respective interests in the execution, and the defendants and *Levi Baxter* remained the sole proprietors of the lands purchased. These twenty-five lots were worth in cash, at the time of the sale, under a good title, (and we have no evidence that *Platner's* title was not good,) 28,950 dollars, and on credit, 57,900 dollars; and in 1818, on credit, 173,700 dollars. The defendant *W.*, in his answer, gives the same account of the sale, and says that he had, previous to the sale, searched the clerk's office, and believed that many of the *Platner* lots " might become an object worthy of attention." He says further, that after making the said purchases, he had been enabled, " agreeably to his original expectation, to have several of the lots settled, and the titles adjusted and quieted."

*Benjamin Tucker* appears to be a witness of very fair and unimpeachable credit, and he attended the *Cayuga* sales, and gives a more detailed account of the transactions that took place. He says, the place of sale was much more retired and secluded than other places in the same town, and that he attended to redeem a lot, and part of another lot, which were held under *Platner*, and were considered to be bound by the judgment. That he purchased in that lot, and the half of another, amounting, in the whole, to 900 acres, for a nominal sum, and that the defendant *W.* purchased all the other lots that were sold, and gave not more than a dollar, for each lot of 600 acres. That the defendants were not disposed to come to any terms of accommodation with him, in respect to his land; and after three or four lots had been sold, he declared, in the hearing of the defendants, that in order to save his lot, he would bid to the amount of the execution, on the next lot that was set up; that the sale was then stopped, at the instance of the defendants, and the witness was called aside by one of them, and told that they would not bid on his lot, if he would engage not to bid on any other lot; that he agreed to this proposition, and after some other lots were sold, the lots of the witness were set up, and he bid his land off, without opposition, for a sum less than two dollars, and took the sheriff's deed.

These facts are conclusive upon the case of the *Cayuga* sales, and show that they were a mere mockery of justice, and perverted to the total sacrifice of the rights of *Platner*. Comment upon them becomes useless. We cannot hesitate, for a moment, in pronouncing the whole proceeding an act of fraud. Here, also, if not before, the execution is to be deemed satisfied and discharged by the act of the party.

5. The defendants, however, giving credit on the execution for the sum of 11 dollars 28 cents, according to the sheriff's return, proceed next to the county of *Onondaga.*

1820.

TROUP
v.
WOOD.

Sales by the
sheriff of *Onon-*
*daga,* under
the execution,
fraudulent and
void.

It seems their intemperate avidity for speculation was not capable of being satiated with success, nor cooled by time. The *Onondaga* sales were not made until the 15th of *Octo-* *ber*, 1806. The balance then due had increased by the addition of interest, (according to an estimate on the part of the defendants,) to 117 dollars 6 cents. The defendant, *S.*, says, that he was present at the sales, and that twenty-two lots, lying dispersed in eleven towns, were sold by a deputy sheriff, and purchased in by the defendant *W.* That nothing was said, at the time of the sale, relative to the judgment, or the amount due thereon. The purchase money for these twenty-two lots, was 18 dollars 52 cents; yet it is in proof that the cash value of those lots, at the time of the sale, was 19,800 dollars, and on a credit, 31,600 dollars; and when the testimony was taken, 94,800 dollars, at a credit. The defendant *W.* gives the same account of these *Onondaga* sales, and says, that the deed was executed by the deputy, on the day of the sale, to the three associates, being the defendants and *Baxter*, and that the people were deterred from bidding, under an opinion that the *Platner* title was bad.

This is all the information touching these last sales, and the facts admitted speak for themselves.

Sales by the
sheriff of *Sene-*
*ca,* under the
execution, also
fraudulent and
void.

6. The next epocha in the history of this case, is the sale in *Seneca* county, on the 25th of *May*, 1807. The defendant *S.* says, his two associates attended, and a number of lots were sold for the benefit of the concern. The defendant *W.* says, that 11 lots were sold for the benefit of the concern. The defendant *W.* says, that 11 lots, lying in five towns, were sold under the same judgment, and upon an execution issued for the remaining balance, and bid off by him and *Baxter*, for 28 dollars. According to an estimate, made by a witness, *Humphrey Howland*, those 11 lots were worth, in cash, at the time of the sale, 14,750 dollars, and on a credit, 29,500; and on a sale on credit, at the time he gave his testimony, 78,500 dollars.

But the cupidity of the defendants was still insatiable, and the two lots of the plaintiff, lying in the then county of *Onondaga*, were afterwards seized and sold.   The defendant *S.* says, that he claims a title to those two lots by virtue of a sale by the sheriff of *Onondaga*, under the judgment, in the summer of 1807.   The defendant *W.* is more precise as to the time, and says, that the sale was on the 7th of *September*, 1807, and that the two lots, claimed by the plaintiff, were, *with others*, purchased by the three associates, at such sale, under the aforesaid judgment of *Bachman.*   He says, that in *October* following, he took possession of the two lots, as owner; and afterwards, on the 30th of *September*, 1812, sold them to the defendant *S.*   On the same day, according to the answer of the defendant *S.*, *Baxter*, also, released his right to these two lots, so that the defendant *S.* is now the sole owner under the judgment title.   He shows no other title, nor does he pretend to any other, and declares that he entertains no apprehension that the title derived under the said judgment is not good.

It may here be observed, that the plaintiff shows a title to those two lots, derived from a purchase from *Platner*, in *May*, 1792.

The conclusion, from this review of the case, is, that the sale of the plaintiff's lots, in 1807, was fraudulent and void. There are several acts in the progress of the proceedings under the judgment, between 1798 and 1807, from each of which the like conclusion might be drawn.

The counsel for the defendants were so pressed upon the argument, with the weight of the proof, that they offered, in behalf of the defendant *S.*, to release all claim and title to the lots of the plaintiff, under the sale in 1807, but objected to a surrender of the possession, or to make a more general release.   But the defendants do not set up, or produce, any title, or semblance of title, other than that derived under the judgment, and as the plaintiff received a deed of the lots from *Platner*, in 1792, for a valuable consideration, the

necessary intendment of law, in the absence of all proof to the contrary, is, that the title of the plaintiff is a good and valid title. The defendants have precluded themselves from questioning the original title of *Platner*, for they set up no title but under him, and they certainly ought not to be permitted to derive any advantage whatever from their fraud, or to retain a possession so unjustly acquired. They are bound in equity to quiet the plaintiff's title, by every act in their power, as some compensation for the injury they have done him. They ought, therefore, to release all claim and pretension to the lots, and to account for the rents and profits, and for all intermediate waste. The defendants ought to be equally charged under the decree, for the acts of fraud were joint acts; and though the one defendant has conveyed his right in the lots to the other, yet this was an act done *pendente lite*, and more than two months subsequent to the filing of the bill.

I might, perhaps, have rested the cause upon some one of the selected points, without examining the others, yet I have deemed it fit and proper, for the sake of example, to review every part of the history of the case which has been laid before me. It is not, however, without pain and regret, that I have felt myself under the necessity of using strong language of reproof and censure upon so many of the circumstances that occurred. Such a case can never be permitted to pass without animadversion, and I hope that this, and many other instances of like abuses, which I have to deal with, may, by the correction they receive, teach a lesson of wisdom and accuracy, moderation and justice, on future occasions.

*Decree.*  The following decree was entered: " It appearing to the Court, that the judgment in favour of *Abraham Bachman* against *Henry Platner*, mentioned in the pleadings and proofs in this cause, was satisfied by a settlement made by and between the parties to it, in the year 1798 ;

And it further appearing, that the said judgment, on the supposition that it was not so discharged, was not duly revived by *scire facias*, after *Henry Platner* had been convicted of felony, and sentenced to imprisonment in the state prison for life : And it further appearing, that the balance assumed to have been remaining and due upon the said judgment in 1800, was satisfied upon the execution of the writ of *testatum fieri facias*, also mentioned in the pleadings and proofs, to have been issued thereon to the sheriff of the county of *Delaware* : And it further appearing, that the subsequent execution issued upon the said judgment, to the sheriff of the county of *Cayuga*, also mentioned in the pleadings and proofs, was fraudulently issued and executed, and that the sales under it were fraudulently made by the act and procurement of the defendants : And it further appearing, that the subsequent executions issued upon the said judgment to the sheriffs, respectively, of the counties of *Onondaga* and *Seneca*, also mentioned in the pleadings and proofs, were fraudulently issued and executed : It is thereupon *ordered, adjudged,* and *decreed,* that the title acquired by the defendants and *Levi Baxter,* and afterwards vested in the defendant *Samuel Sherwood,* by sale, under the writ of *testatum fieri facias,* issued upon the said judgment to the sheriff of the county of *Onondaga,* to lot No. 33, in the town of *Lysander,* and lot No. 76, in the town of *Solon,* then in the same county, be, and the same is hereby declared to be fraudulent and void : And it is further *ordered,* &c., that the defendants, respectively, within thirty days after notice of this decree, under the direction of one of the Masters of this Court, by good and sufficient deeds of conveyance, containing apt covenants against their own acts and deeds, release and convey to the plaintiff, his heirs and assigns, forever, all their respective right and title, claim and demand, to the said lots of land, with the hereditaments and appurtenances to the same belonging ; and that they, also, within the same time, deliver to the plaintiff, the full,

peaceable, and actual possession of the said lots. And it is further *ordered*, &c. that the defendants pay to the plaintiff his costs of this suit, to be taxed, and that they respectively account to and with the plaintiff, for the rents, issues, and profits of the said lots, and for the damages arising from any and all manner of waste committed thereon since the defendants, or either of them, or persons holding under them, or either of them, obtained the possession of the said lots; and that a reference be made to one of the Masters of this Court to ascertain and report the amount thereof, and that when such report shall have been made and confirmed, the plaintiff may have execution for the amount thereof, together with his costs, according to the course and practice of the Court."

