JOHN M. AVERY, Appellant, v. GEORGE EVERETT, Impleaded, etc., Respondent.

The will of S. devised his real estate to his wife for life if she remained unmarried, and upon her decease or marriage, to C ; in case of the death of the latter without children, the remainder to go to A. *Held*, that upon the testator's death C. took a vested remainder in fee, subject to be defeated by his death without children, upon which event the substituted remainder, given on that contingency to A., would vest in possession.

The wife of the testator survived him, and after her death C., who, at the time was unmarried and without children, was convicted of murder in the second degree and sentenced to imprisonment in a state's prison for life. In an action of ejectment wherein plaintiff claimed under A., brought while C. was living, *held* (EARL, J., dissenting), that the title of C. to the real estate devised was not divested as a consequence of his sentence, and that A. or his grantee had no present vested interest upon which to maintain ejectment.

Assuming a civil death consequent upon such a sentence, operates *eo instanti* to divest the person sentenced of his estate, whether such a death was contemplated by the testator, and the words of limitation to A. were to be construed as applying only to the natural death of C., *quære*.

By the general rule of the common law civil death did not operate as a divestiture of the estate of the convicted. Whatever may have been the effect of the provision of the act of 1799 (Chap. 57, Laws of 1799), declaring that where a person shall be convicted for felony and sentenced to imprisonment for life, such person shall be deemed to be "civilly dead to all intents and purposes in the law," when the language was changed by the provision of the Revised Statutes (2 R. S. 701, § 20,

re-enacted in Penal Code, § 708), enacting simply that a person sentenced to imprisonment for life " shall thereafter be deemed civilly dead " this was declaratory of and restored the rule of the common law.   (EARL, J dissenting.)

*It seems* the statutory provisions regulating the transfer and devolution of property upon the death of the owner, refer simply to a natural, actual death.

A resume of legislation and of judicial decisions in this state and in England upon the subject of property rights, as affected by civil death, given.

(Submitted November 28, 1887;  decided October 2, 1888.)

APPEAL from order of the General Term of the Supreme Court in the fifth judicial department, made April 23, 1885, which reversed a judgment in favor of plaintiff, entered upon a decision of the court on trial without a jury.  (Reported below, 36 Hun, 6.)

This was an action of ejectment brought to recover possession of certain real estate situate in Cayuga county, of which John H. Southwick died seized.

Said Southwick died leaving a will, of the material clause in which the following is a copy:

"I also give, devise and bequeath to my beloved wife Eliza Ann, all my real estate as long as she shall remain unmarried and my widow, but on her decease or marriage then what may remain of said real or personal property I give and devise to my son Charles H.  In case my son Charles H. should die without children, then after my wife Eliza Ann's death and my son Charles H. death, my will is, all the property, real or personal that may remain, shall go to Augustus Southwick, of Pennsylvania, my brother Nathan's son."

Plaintiff claimed under a conveyance to Augustus Southwick.

The further material facts are stated in the opinion.

*Rhodes, Coon & Higgins* for appellant.  A person sentenced to imprisonment in a state prison for life shall there-

after be deemed civilly dead. (Act of March 29, 1799, § 22, chap. 57 ; 1 R. S. [6th ed.] 994, § 20 ; Penal Code, § 708.) All statutes are to be construed with reference to the principles of the common law in force at the time of their passage, and all words having a well known and definite meaning at common law are presumed to be used in the same sense when they appear in a statute. (Dwarris on Stat. 564, 565 ; Sedg. on Stat. and Const. Law, 221 ; *U. S.* v. *Jones*, 3 Wash. C. C. 200 ; *Rawlins* v. *Vidvard*, 34 Hun, 205, 207.) A person sentenced to imprisonment for life in a state prison in this state, becoming civilly dead, thereby forfeits all his rights of property and his estate descends to his heirs, or is administered upon according to law as if he were actually dead. (*Troup* v. *Wood*, 4 Johns. Ch. 228–247 ; *Platner* v. *Sherwood*, 6 id. 118, 120, 130, 131 ; *In re Deming*, 10 Johns. 262 ; *Freeman* v. *Frank*, 10 Abb. Pr. 371 ; *Davis* v. *Duffie*, 1 Abb. Ct. App. Dec. 489 ; *S. C.*, 4 Abb. Pr. [N. S.] 482 ; *Graham* v. *Adams*, 2 Johns. Cas. 408 ; 1 Bla. Com. 132 ; 2 id. 121 ; Co. on Litt. §§ 133, 200 ; *Marsh* v. *Hutchinson*, 2 Bos. & Pul. 226–231 ; *Wright* v. *Wright*, 2 Des. 242, 244 ; Bouv. Law Dict., Title, Civil Death.) The disqualifications resulting from a sentence of imprisonment commence from the moment of passing sentence. (*Miller* v. *Tinkle*, 1 Park. Cr. R. 377.) In general the interest of a testator must be gathered, not merely from the language used in the will, but from that language in connection with the law of the land. (*Pennoyer* v. *Sheldon*, 4 Blatch. 319 ; Phil. Eq. [N. C.] 8 ; *Clark* v. *Mosely*, 1 Rich. Eq. 396 ; Schouler on Wills, 479, § 469 ; *Myers* v. *Eddy*, 47 Barb. 263 ; *Hawley* v. *Northampton*, 8 Mass. 3, 37.) Technical words employed in a will are presumed to have been used in their settled legal meaning unless the contrary is manifest. (*Needham* v. *Ide*, 5 Pick. 510 ; *De Kay* v. *Irving*, 5 Denio, 646 ; *Jackson* v. *Kip*, 2 Paige, 366 ; 2 Jarman on Wills, 842 ; *Feltham* v. *Butts*, 8 Bush. 115 ; 6 Ch. D. 496 ; Doug. 340 ; 4 Ves. 329.) The clause " then what may remain of said real and personal property " does not, as respondent claims, enlarge the widow's life estate to a fee, and, therefore, render the

remainder-over void. (1 R. S. 732, § 81; *Taggart* v. *Murray*, 53 N. Y. 233, 238; *Terry* v. *Wiggins*, 47 id. 512, 518; *S. C.*, 2 Lans. 272; *Bliven* v. *Seymour*, 88 N. Y. 469, 477; *Doe* v. *Howland*, 8 Cow. 277.) The words " shall go to " express the intent of the testator as clearly as more formal legal phraseology. (*Bliven* v. *Seymour*, 88 N. Y. 469, 476.)

*William Tiffany* for respondent. The will gives to Charles H., the son, the remainder in fee " in clear, positive and express terms and language known to the law, and which calls for no interpretation." This passes the fee and all the interest of the testator, "unless the intent to pass a less estate appears by express terms, or be necessarily implied in the terms of the will. (2 R. S. chap. 1, tit. 5, § 1 [6th ed.] 1130; *Kelley* v. *Kelley*, 5 Lans. 443, 444.) The words, " what may remain," are precisely equivalent to the words " the remainder," and such an estate may be created and transferred by that name. (2 R. S. chap. 1, tit. 2, § 11.) It is evident from the whole will that the testator intended to dispose of his entire estate, and the will should be so construed as to effect that end, if possible. (*Jackson* v. *Merrill*, 6 Johns. 191; *Vernon* v. *Vernon*, 53 N. Y. 361; *Thomas* v. *Thomas*, 43 Hun, 15; *Buckland* v. *Gallapp*, 22 Week. Dig. 23.) The words in the will, " in case my son, Charles H., should die without children," have reference to the death of Charles H., before the death of the testator, and not to his subsequent death. (*Gibson* v. *Walker*, 20 N. Y. 128; *Kelly* v. *Kelly*, 5 Lans. 423, 445; *Quackenbos* v. *Kingsland*, 102 N. Y. 128; *In re N. Y. L. & W. R. R. Co.*, 26 N. Y. Week. Dig. 133; *Campbell* v. *Beaumont*, 91 N. Y. 465; *Van Horn* v. *Campbell*, 100 id. 287.) If the son Charles H. died before the death of the testator, leaving children, such children would take the estate devised to him in his stead. (2 R. S. chap. 6, tit. 1, art. 3, § 52; *Livingstone* v. *Green*, 6 Lans. 54; *Taggart* v. *Murray*, 53 N. Y. 238, 239; *Clarke* v. *Leupp*, 88 id. 231; *Murray* v. *Douglass*, 5 id. 453; *Parsons* v. *Best*, 1 Sup. Ct. [T. & C.] 211, 213.) If the son might dispose of the real estate, then,

any remainder limited upon his estate, his estate being the fee, would be utterly void, and the claim of a devise to Augustus Southwick fails. (*Brewster* v. *Bull*, 10 Johns. 19; *Livingstone* v. *Robins*, 16 Johns. 19; *Livingstone* v. *Delancy*, 13 id. 537; *McKenzie's Appeal*, 41 Conn. 607; 19 Am. Rep. 525; *Atty. Gen.* v. *Hull*, Fitz. 314; *Ramsdel* v. *Ramsdel*, 2 Me. 288; *Harris* v. *Knapp*, 21 Pick. 416; *Lynch* v. *Easterbrook*, 7 Allen, 68; *Fisk* v. *Cobb*, 6 Gray, 144; *Homer* v. *Shelton*, 2 Metc. 202; 4 Kent's Com. 270; 1 Jarman on Wills [Perkins' ed.] 677, *note* 2.) The title of Charles H. Southwick was not divested by his conviction and sentence to the state prison for life. (*Planter* v. *Sherwood*, 6 Johns. Ch. 118, 127.) Civil death is the separation of a man from civil society, or from the enjoyment of civil rights, as by banishment, abjuration of the realm or entering into a monastery. (1 Black. Com. 132; 1 Bouvier's L. Dict. 232; *Freeman* v. *Frank*, 10 Abb. Pr. 370; *Kynnaird* v. *Leslie*, 1 S. R., C. P. 289; *S. C.*, 12 Jur. [N. S.] 468; 35 L. J., C. P. 226; 14 W. R. 761; 14 S. T. [N. S.] 756; *Doe ex d. Griffith* v. *Pritchard*, 5 B. & Ad. 765; *Evans* v. *Pritchard*, 2 N. M. 489; *Ramsey* v. *McDonald*, 1 W. Bl. 30; 1 Wils. 217; *Davis* v. *Duffer*, 1 Abb. Ct.App. Dec. 486; 8 Bosw. 617; *Bowles* v. *Habeman*, 95 N. Y. 246, 249, 250; *Bishop* v. *Curtis*, 17 Jur. 23; 21 L. J., Q. B. 391; 18 Q. B. 878; *Combs* v. *Queen's Proctor*, 2 Rob. Ecc. Rep. 547; 16 Jur. 820.)

ANDREWS, J. We concur in the conclusion of the courts below that, by the true construction of the will of John H. Southwick, his son, Charles H. Southwick, took, upon the testator's death, a vested remainder in fee, limited upon the life estate of his mother in the premises in question, subject, however, to be defeated by a condition subsequent, viz., his death without children, in which event the substituted remainder given in that contingency to Augustus Southwick, the son of the testator's brother Nathan, would vest in possession, thereby displacing the prior fee given to the testator's son Charles.

(*Vanderzee* v. *Slingerland*, 103 N. Y. 47; *In re N. Y., L. & W. R. R. Co.*, 105 id. 89.) The plaintiff claims under the devise to Augustus Southwick. The widow of the testator died September 1, 1869, after the death of her husband. Charles H. Southwick is still living, unmarried, and without children. If nothing further appeared, the plaintiff's action would necessarily fail for the reason that the contingency had not happened upon which the estate of Augustus Southwick is limited, and the defendant George Everett, who is the lessee of Charles H. Southwick, would be entitled to judgment. The plaintiff, to obviate this apparent difficulty, proved that Charles H. Southwick, in October, 1875, was convicted of the crime of murder in the second degree and was thereupon sentenced to imprisonment in the state prison at Auburn for the term of his natural life, and, from that time, has been imprisoned pursuant to such sentence. The plaintiff contends that, as the life estate of the widow was terminated by her death, and as Charles H., on his sentence to imprisonment for life, became civilly dead, the contingent estate given by the will to Augustus Southwick in case "Charles H. should die without children," his became an actual fee.

Assuming that a civil death consequent upon a sentence to imprisonment for life, operates *eo instanti* to divest the person sentenced of his estate, a point we shall hereafter consider, there is still another question, viz.: Whether such a death was contemplated by the testator, and whether the words of limitation to Augustus Southwick are to be construed as applying to a civil, or only to the natural death of Charles H. Southwick. It is possible that Charles H. may be pardoned and may marry and have children. It is plain that Augustus Southwick can take only according to the will, and that if, by its true construction, the natural death of Charles H., without children, was solely the contingency upon which the substituted fee is to vest, the plaintiff must fail on this ground, independently of any other, and whatever conclusion might be reached as to the effect of the civil death of Charles H. upon his own estate under the will. It is said by Coke

(Co. Litt. § 200), speaking of the two species of death, *mors civilis* and *mors naturalis*, that to " oust all scruples, leases for life are ever made during the natural life," etc. We have found no authority upon the construction of the word " death " in a will as applied to circumstances like these in the present case. We deem it unnecessary to decide the point suggested, as we are of opinion that the title of Charles H. Southwick to his land was not divested as a consequence of his sentence to imprisonment for life ; and it follows, as a necessary consequence, that Augustus Southwick, or his grantee, has no present vested interest upon which to maintain ejectment.

The Revised Statues declare that a person sentenced to imprisonment for life " shall thereafter be deemed civilly dead. " (2 R. S. 701, § 20.) This provision was re-enacted in the Penal Code (§ 708). The only statutory provision on this subject existing in this state prior to the Revised Statutes is found in an act passed March 29, 1799, which enacted that in all cases where a person shall be convicted and attainted of any felony *thereafter* committed and adjudged to imprisonment for life in the state prison, " such person shall be deemed and taken to be civilly dead to all intents and purposes in the law," and the statute of 1799 remained unchanged until the provision in the Revised Statutes, to which we have referred, was substituted. (1 Rev. Laws of 1813, 411.) In the absence of any legislation on the subject, the common-law consequences of a conviction for felony attached in this state and remained until abrogated or changed by Constitution or statute. (2 Kent, 386.) By the common law the civil death of the offender was one of the consequences of attainder for treason or felony, and in *Troup* v. *Wood* (4 Johns. Ch. 248), the chancellor seemed to entertain no doubt that, on a conviction in this state, prior to 1799, of an offense which was a felony at common law, the common-law incident of civil death attached, and this as well where the statute had changed the punishment from death to imprisonment for life as in the case of a capital sentence.

To ascertain the meaning of the phrase "civil death," as used in the Revised Statutes, and whether the statute, on a sentence of an offender to imprisonment for life, operates *eo instanti* to divest him of his estate, it is important to consider how civil death affected rights of property at common law. By the ancient common law when sentence was pronounced for a capital offense, the offender by operation of law was placed in a state of attainder. (1 Chitty on Crim. Law, 723.) There were three principal incidents consequent upon an attainder for treason or felony, viz., forfeiture, corruption of blood and an extinction of civil rights, more or less complete, which was denominated civil death. Forfeiture was a part of the punishment of the crime, and was of Saxon origin, by which the goods and chattels, lands and tenements of the attainted felon were forfeited to the king, the former absolutely on conviction, and the latter perpetually, or during the life of the offender, on sentence being pronounced. The doctrine of corruption of blood was of feudal origin, introduced after the Norman Conquest. The blood of the attainted person was deemed to be corrupted, so that neither could he transmit his estate to his heirs, nor could they take by descent from the ancestor. The crime of the attainted felon was deemed a breach of the implied condition in the donation of the feud, *dum bene se gesserét*, and the descent to his heirs being interrupted by the corruption of blood, his lands escheated to the lord. But this escheat was subordinate to the prior and superior law of forfeiture. (Comyn, tit. Forfeiture, K; 2 Black. Com. 252; 1 Chitty on Crim. Law, 723–728; Broom & Had. Com. 404; 1 Salk. 85.) The incident of civil death attended every attainder of treason or felony, whereby, in the language of Lord Coke, the attainted person "is disabled to bring any action, for he is *extra legem positus*, and is accounted in law *civiliter mortuus*" (Co. Litt. § 199, *note*), or, as stated by Chitty (1 Crim. Law, 724), "he is disqualified from being a witness, can bring no action, nor perform any legal function, he is, in short, regarded as dead in law." The forfeiture of the estate of the attainted felon

to the king or to the lord, was not a consequence of the situation in which he was placed, of *civiliter mortuus*, but proceeded upon distinct and independent reasons, and this, we think, is rendered plain when we consider how the law of forfeiture was construed. The attainted person was not divested of his lands till office found. This is very distinctly held in *Nichols* v. *Nichols* (Plowd. 486), where the question was put, "if the possession in deed or law, of the lands of a person attainted of treason, should not be in the king before office found, in whom should it be by the course of the common law in the life of the person attainted?" And it was held that the freehold of such lands would be, in fact, in the person attainted, so long as he should live; "for, as he hath capacity to take in deed lands by a new purchase, so hath he power to retain his ancient possessions, and he shall be tenant to every *præcipe*." (See, also, Vin. Abr. tit. Forfeiture, 9.) So, also, the better opinion is that he could devise his lands, subject only to the right of entry for the forfeiture. In Bacon's Abridgment, title, Wills and Testament, B., it is said that "however the wills of traitors, aliens, felons and outlawed persons are void as to the king or lord that has the right to the lands or goods by forfeiture, yet the will is good against the testator himself and all others but such person only." (See, also, Vin. Abr., title, Attainder; 1 Jar. [Bigelow's 5th ed.] 42.) An attainted person could also demise his lands before office found. This was expressly held in *Doe* v. *Pritchard* (5 B. & Ad. 765), citing a passage from Perkins "that a man attainted of felony or murder may make a grant of a rent, or common, or a feoffment, and the same shall bind all persons but the king and the lord, of whom the land is holden." So a person attainted could take lands by devise or purchase. He could be grantor or grantee after attainder, and the grant would be good as against all persons, except the king. (Vin. Abr., title, Attainder; Shep. Touch. 231; Perkins, 26, 48.) He could not sue, but could be sued (Vin. Abr. *supra*), and his body could be taken in execution, subject, however, to the paramount claims of public justice. (1 Chitty

on Crim. Law, 725; *Davis* v. *Duffie*, 1 Abb. Ct. App. Dec. 489.) He could make no contract which he could enforce. In *Kynnaird* v. *Leslie* (1 Com. Pl., L. R. 389), it was said by WILLES, J.: "Moreover, an attainted person is not incapable of contracting, though he cannot pray in aid of the king's court, to enforce his contracts. He can contract with those whose consciences bind them to fulfill their engagements, and he can take a grant, or grant to others, even the inheritance which, on office found, would escheat to the crown; and the rights so acquired by third parties may be the subject of an action in her majesty's courts, and his contracts may be enforced against him." In the case last cited it was held that when one attainted of treason escaped to a foreign country and there married and had children, and was afterwards executed on the same attainder, the marriage was valid and the children legitimate, and that they could inherit from each other, since they were not compelled to trace the inheritance through the ancestor. It seems to be a necessary conclusion from the rules of the common law governing rights of property as affected by forfeiture for crime, that civil death, one of the consequences of conviction for treason or felony did not of itself, as a general rule, at least, operate to divest the offender of his title to his lands. This would be inconsistent with the settled doctrine that an attainted person retained his title and possession till office found, and that meanwhile he could make a grant or demise good except as against the king. If civil death worked of itself a divestiture of his estate, either no entry would be necessary to complete the title of the crown by forfeiture, or the alternative result would follow, that the title would be in abeyance from the time of the attainder until entry by the king or lord, for the heir could not take by reason of corruption of blood, and the felon's title would be gone by his civil death. But we have not been able to find any case showing that, as a general rule, civil death modified in any respect the law of forfeiture, or deprived the attainted person of his lands before the forfeiture was enforced by entry. The appellant, to sustain his contention that by the common

law civil death, consequent upon attainder, operated *eo instanti* to divest the title of the offender to his lands, relies upon the text of Littleton (§ 200) and the Commentaries of Lord COKE. Littleton, in the section cited, speaking of the classes of persons who cannot maintain an action, mentions as the fifth class, persons who have entered into religion and become monks professed. Such a person, he says, " is dead in the law, and his *sonne* or next cousin incontinent shall inherit him as well as though he were dead indeed. And when he entereth into religion he may make his testament and his executors; and they may have an action of debt due to him before his entry into religion, or any other action that executors may have, as if he were dead indeed; and if he make no executors when he entereth into religion, then the ordinary may commit the administration of his goods to others as if he were dead indeed." The doctrine that persons entering into religion and becoming monks professed were civilly dead proceeded on the ground that as they thereby renounced all secular concerns and held themselves freed from the obligations resting upon other members of civil society, they should be treated as though they were dead, in fact, and as having surrendered all their civil rights. (1 Bl. Com. 132.) COKE, in commenting on the passage from Littleton above quoted, says: " And here it is to be observed that an abjuration, that is, a deportation forever into a *forreine* land like to profession (whereof our author speaketh here), is a civil death, and that is the reason that the wife may bring an action, etc. And so it is if, by an act of parliament, the husband be attainted of treason or felony, and, saving his life, is banished, this is a civil death and the wife may sue as a *femme sole*." It will be observed that COKE adds two instances of civil death to the one mentioned by Littleton, namely, abjuration and banishment on attainder by act of parliament. But in his note to section 199, already quoted, he declares that every person attainted of high treason, petit treason, or felony, is accounted in law " *civiliter mortuus*." The fair conclusion, from a comparison of these passages, is that the strict

civil death, mentioned by Littleton in the case of a monk professed, which was followed by an extinction of civil rights, including the right of property, was confined to monks and the two other cases mentioned by COKE. This seems to have been the interpretation of BLACKSTONE, who in the enumeration of the causes of civil death, in which the next heir inherits the estate as though the ancestor was absolutely dead, mentions the three cases of profession, abjuration and banishment, and no others. (1 Bla. Com. 132.) In case of profession the civil death was not a consequence of crime. Abjuration, which was connected with the law of sanctuary, was a method by which a criminal escaped punishment on condition of taking an oath of abjuration and leaving the realm forever. Banishment on attainder by act of parliament, was a power only exerted in rare instances. Both sanctury and abjuration were abolished by statute. (21 Jac. I, C. 28.) The statute 54 George III, C. 45 abolished forfeiture of lands, and corruption of blood in every case except treason, petit treason and murder. "So that," as said by Chitty, writing soon after the passage of that statute, "at the present day on attainder of ordinary felony the criminal forfeits only his goods and chattels, and the profits of land during life, while his real estate comes in the ordinary channels to his heir, who is thus restored to the full capacity to inherit." (1 Chitty's Crim. Law, 735.) Still later the statute 33 and 34 Victoria, C. 23 swept away the whole doctrine of attainder, corruption of blood and forfeiture, except forfeiture consequent on outlawry, and the same statute provided for the administration of the estate of the convicted felon by trustees for the benefit of his creditors and the support of his family. Under this statute the real property of a traitor or felon remains his own, subject to the temporary estate of the trustees, and he may dispose of it by his will, but, by the statute, he is incapable of alienating or charging his property, or of making any contract. (1 Jar. [Bigelow's 5th ed.] 44.) It is a suggestive fact bearing upon the point we are considering, that no case is to be found either

before or after the statute 54 George III, in which it has been held that a conviction of felony cast the descent of the felon's land upon his heirs, as though he was dead in fact. And since the statutes 33 and 34 Victoria, it is certain that such a doctrine has been unknown to the law of England. That statute assumed that the title of the felon to his lands was not divested by his conviction.

It remains to consider how the question stands in the light of our own statutes and decisions. The cases on the subject are few, but there are two which deserve especial attention, *Troup* v. *Wood* (4 J. Ch. 248), and *Platner* v. *Sherwood* (6 J. Ch. 118), decided in 1820 and 1822. Both related to lands which had been owned by one Platner, who in June, 1799, was convicted of forgery and sentenced to the state prison for life. He was pardoned in 1806. The trial and conviction was after the passage of the act of March 29, 1799, but the offense was committed prior thereto. In *Troup* v. *Wood*, the bill was filed by a grantee of Platner, under a deed executed before his conviction in 1792, to set aside sales of the same lands, made after Platner's conviction and sentence and during his imprisonment under judgments against him, obtained prior to the complainant's deed. The chancellor, rendered a decree setting aside the sales and titles acquired by the defendants, under the executions, upon several grounds, one of which was that the judgment upon which the execution issued had been fully paid prior to the sales thereon, and that the sales were fraudulently made by the act and procurement of the defendants. The chancellor in his opinion, after stating this conclusive ground of judgment, proceeded further to say, that the sales were also void for another reason, viz., that the *scire facias* to revive the judgment against Platner was directed to him, whereas, as by his conviction and sentence to imprisonment for life he became civilly dead, it should have been directed "to his representatives and to the terre-tenants." This plainly implied that the chancellor then entertained the opinion that a civil

SICKELS—VOL. LXV.    42

death, consequent upon a conviction of felony, divested the offender's estate, and the heirs immediately inherited, as in case of actual death, forfeiture and corruption of blood having been previously abolished in this state, except forfeiture for a limited time in case of treason. The subsequent case of *Platner* v. *Sherwood* was brought by Platner, after his pardon, to set aside sales of other lands made during his imprisonment under the same judgments and executions, as in the former case, the title to such lands having been in him at the time of his conviction and sentence. The defendant demurred to the bill on the ground that the plaintiff was divested of his estate in the lands by his conviction and imprisonment, and that his heirs were the parties in interest. It is plain that the demurrer was good, provided the chancellor was correct in his opinion in the former case as to the effect of civil death at common law in divesting the estate of a convicted felon. But the chancellor, on reconsideration, reversed his previous ruling on this point and held that at common law that consequence did not follow the situation of *civiliter mortuus*, except in the special cases to which we have referred. He, therefore, sustained the bill, suggesting, as a reason for his misapprehension in the former case, that the statute of March 29, 1799, which was in force when the trial and conviction took place and when the former decision was made, only applied to offenses *thereafter* committed. This suggestion in turn implied, although the question was not involved in the case, that the statute of 1799, declaring that a person adjudged to imprisonment for life on a conviction of felony, "shall be deemed and taken to be civilly dead to all intents and purposes in the law," extended the common-law consequences of civil death and made the estate of the convicted felon descendible immediately to his heirs. The case *In re Deming* (10 Johns. 232) presented the question of the effect of a pardon of a person convicted of a felony, and sentenced to imprisonment for life, upon his right to the guardianship of his infant child, after his release from imprisonment. It was held that the pardon restored him to the

relation of a father, but it was assumed in the brief *per curiam* opinion in the case that any rights of property in the convict were divested by the conviction and sentence. This case arose when the act of 1799 was in force. The case of *Platner* v. *Sherwood* was a direct adjudication that, by the general rule of the common law, civil death did not operate as a divestiture of the estate of the convicted felon. The language of the act of 1799, that a person sentenced to imprisonment for life was to be deemed civilly dead, "to all intents and purposes in the law," was very special and comprehensive, and it is not necessary to disagree with the intimation of the chancellor, that it extended the consequences of civil death beyond what was understood at common law. However this may be, when the language of the act of 1799 was changed by the Revised Statutes, by omitting the special and peculiar words therein, and the language was substituted that a person sentenced to imprisonment for life should thereafter "be deemed civilly dead," the provision became, we think, simply declaratory of the common law. On looking at the statutes regulating the transfer and devolution of property upon the death of the owner, it will be found that their natural import confines the meaning to a natural death. By the former statute of wills it is declared that "all persons except idiots, persons of unsound mind, married women and infants, may devise their real estate," etc., and, as to personal property, that "every male person of the age of eighteen years, and every person not being a married woman," may dispose of it by will (2 R. S. 60, § 21); and provisions are made for the probate of wills after the death of the testator. The statute of administrations authorizes the granting of letters of administration of the goods, chattels and credits of persons "dying intestate." (2 R. S. 73, § 23.) The statute regulating proceedings to discover the death of persons upon whose lives any particular estate may depend, requires that the petitioner shall state in his petition "that he has cause to believe, and does believe, that the person upon whose life such prior estate depends is dead," etc. (2 R. S. 343, § 2.) An

assignment of dower can be claimed only on the death of the husband. (1 R. S. 740, § 1 *et seq.*) In none of these statutes is there any intimation that a civil, as distinguished from a natural, death was in the contemplation of the legislature. The only statute we have found which permits an inference that civil death, consequent upon imprisonment for life, operates to divest the convict of his estate, is a provision in the act relating to "absconding, concealed and non-resident debtors," which permits the proceedings authorized thereby to be taken "whenever any debtor shall be imprisoned in the state prison for a term *less* than his natural life" (2 R. S. 15, § 1); making no provision and giving no remedy under that act against the property of one imprisoned on a life sentence. This provision was incorporated into the Revised Statutes from the "Act for relief against absent and absconding debtors," passed March 21, 1801, when the act of March 29, 1799, declaring the effect of a sentence to imprisonment for life, was in force. The most that can be said as to the effect of this section of the absconding debtor act, as bearing upon the point now in controversy, is that the legislature may have assumed that civil death, resulting from a sentence to imprisonment for life, operated to divest the offender of his estate. But when it is considered that no case in this state can be found where the will of a person imprisoned on a life sentence has been admitted to probate during his natural life, or where administration has been granted on his estate, or dower assigned as if he was dead, nor any case where the title to property has been traced through a civil, as distinct from a natural, death, the inference seems almost irresistible that the doctrine that civil death, consequent upon a life sentence, divests the criminal of his estate, has no foundation in our law. (As to right of administration, see *Frazer* v. *Fulcher*, 17 Ohio, 260.) The disabilities flowing from the situation of *civiliter mortuus* have a wide scope, without including this incident. The statute, without expressly declaring this result, assumes that a life sentence of the husband, *ipso facto*, dissolves his marriage. (2 R. S. 687, § 9, sub. 6.) The convict

cannot sue, although he may be sued, and his property is answerable to his creditors. But he may defend an action. brought against him. (Code, § 131 ; *Davis* v. *Duffie, supra ; Bowles* v. *Haberman*, 95 N. Y. 246.) He cannot enter into executory contracts and call in aid the courts to enforce them, but he may transfer his property by will or deed. (See *Rankin's Heirs* v. *Rankin's Executors*, 6 Monroe [Ky.] 531, and authorities, *supra*.) His political rights are taken from him, his wife and children owe him no fealty or obedience. It is easy to suggest possible difficulties in the administration and protection of the property of a con-- vict sentenced to imprisonment for life. These are matters which may be the appropriate subject of legislation. They have been met in England by the statute 33 and 34 Victoria, by which a trustee is appointed to administer the convict's estate for the protection of all interests. Most of the difficulties suggested exist in the same degree in the case of convicts sentenced to imprisonment for a term of years, during which time their civil rights, by force of a prior section. of the statute (§ 19), are suspended. But it is not claimed that this consequence divests them of their property during their imprisonment.

We here conclude our examination of the interesting question presented by this record. Any one who takes the pains. to explore the ancient, and in many respects obsolete, learning connected with the doctrine of civil death, in consequence of crime, will find that he has to grope his way along paths marked by obscure, flickering and sometimes misleading lights, and he cannot feel sure that at some point in his course he has not missed the true road. But there is a guiding principle which, in the present case, greatly aids in solving the question presented, and that is, that no one can or ought to be divested of his property *in invitum*, except by the clear warrant of law, and this, we think, is not found in the statute relating to civil death. The weighty words of Chancellor KENT, in *Platner* v. *Sherwood*, may appropriately conclude this opinion : " The penal consequences of attainder must be.

necessary deductions severely required by the premises; and as there was to be no forfeiture of the estate, the law would not be consistent with itself if it held the party alive for the purpose of being sued and charged in execution, and yet dead for the purpose of transmitting his estate to his heirs."

We think the order of General Term should be affirmed, and judgment absolute entered for the defendant on the stipulation.

EARL, J. (dissenting.) I differ from my brethren, and regret that I have not time to formulate an opinion giving more fully the reasons for my dissent.

The statute of March 29, 1799, providing that life convicts should be " deemed and taken to be civilly dead to all intents and purposes in the law," was, I believe, passed to simplify the law and to remove the confusion and uncertainty which existed in the common law as to the civil death of felons. It brought the law into harmony with our social organization and governmental system. As the convict could no longer discharge any of his obligations to society, he was to possess no civil rights whatever. As he could not discharge any of the duties of husband or father, the family ties were severed. As he could have no use for property and no power to manage or possess the same, that was to pass away from him. He became civilly dead in the law, and the law ceased to know or to take any notice of him. He no longer possessed any rights growing out of organized society or depending upon or given by law. As to all such rights, he was, in law, dead and buried; and such were the views of Chancellor KENT when he wrote the opinions in *Troup* v. *Wood* (4 Johns. Ch. 229), and *Platner* v. *Sherwood* (6 id. 118), and also of the court in *Deming's Case* (10 Johns. 232).

I cannot believe that the legislature, by the different phraseology used in the Revised Statutes (2 R. S. 701, § 20), " shall thereafter be deemed civilly dead," meant to change the scope and meaning of the previous law. The rule was simply expressed in more concise and appropriate language. There

was no reason in revising the prior law to change it, and it cannot be supposed that the legislature meant to abandon a certain and plain rule and go back to the archaisms, uncertainties and confusion of the common law. The progress in the revision was foward, not backward. To show the comprehensive meaning which the law-makers evidently thought the language of section 20 had, we may read the next section providing for the protection of the convict's person as follows: " The person of a convict sentenced to imprisonment in a state prison is under the protection of the law; and any injury to his person, not authorized by law, is punishable in the same manner as if he was not sentenced or convicted." The clear implication from the provision contained in the act relating to "absconding, concealed and non-resident debtors " (2 R. S. 15, § 1), referred to in the opinion of Judge ANDREWS, is that the legislature, when framing that provision, understood that a life convict was divested of his estate.

I not only see no reason to suppose that the legislature meant to retain the common law as to the effect of civil death, but I can see no reason for retaining the common law, or for construing doubtful phraseology so as to retain it. While the convict has no use for his property and no obligations to perform; while he cannot use his property for his comfort, aggrandizement or enjoyment; while he cannot protect it by action or recover it by any proceedings, if taken away from him, why should he be permitted to retain the title thereto — and why should it not, under any wise system of laws, be devolved upon his successors or his heirs and next of kin ?

The life convict was not declared civilly dead in the law simply to deprive him of the right to vote, to sit as a juror, to bear arms, to marry and hold office, because his physical conditions were such that he could do none of these things. What, then, according to the conclusion reached by my brethren, is meant in the statute by " civilly dead ? " How much of the convict is civilly dead and how much civilly alive ? To solve these questions the legal wayfarer will find few blazed

trees along his pathway, which must frequently be obscure, uncertain and easily missed.

I, therefore, favor the reversal of the General Term.

All concur with ANDREWS, J., except EARL, J., dissenting, and GRAY, J., not sitting.

Order affirmed and judgment accordingly.