695 P.2d 391

**Linda Jean WILKINS and Pamela Cay Strack, as Adminstratrixes of the Estate of Norman Mitchell and Betty Mitchell, Plaintiffs-Respondents,**

v.

**FIREMAN'S FUND AMERICAN LIFE INSURANCE COMPANY, Defendant-Appellant.**

**No. 15206.**

Supreme Court of Idaho.

Jan. 31, 1985.

David H. Maguire, Pocatello, for defendant-appellant Fireman's Fund American Life Ins. Co.

Randall C. Budge, Pocatello, for plaintiffs-respondents Linda Jean Wilkins and Pamela Cay Strack.

Gus Carr Anderson, Pocatello, for plaintiff-respondent Betty J. Mitchell.

DONALDSON, Chief Justice.

On January 23, 1978, Norman G. Mitchell was strangled to death. His wife, Betty Jane Mitchell, was subsequently convicted of first degree murder. Her conviction was upheld in *State v. Mitchell*, 104 Idaho 493, 660 P.2d 1336 (1983), *cert. denied*, 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983).

At the time of his death, Mr. Mitchell had an account at Idaho Bank & Trust. Through the bank, Mr. Mitchell had a membership in an organization known as Banclub. Banclub is part of a marketing program utilized by banks to obtain customers. Bank services are provided at free or reduced rates including: free checking, reduced charges for traveler's checks, and accidental death insurance. As an incident of membership in Banclub, Mr. Mitchell was insured with a policy of accidental death benefits of $10,000.

The policy is a group policy issued by Fireman's Fund American Life Insurance Company to Banclub Association of Nashville, Tennessee. The policy provides payment of $10,000 to the named beneficiary, or if there is no surviving designated beneficiary, then to certain persons listed in the insurance contract in descending order. Under Mr. Mitchell's policy, Betty Mitchell was named the primary beneficiary and no contingent beneficiary was designated.

There is an exclusion in the policy which provides as follows:

"Exclusions: This policy does not cover loss caused by, or resulting from, any one or more of the following:

(F) any intentional act by a beneficiary or member of the member's household to commit, or threaten to commit, bodily injury to the member."

I.C. § 15–2–803, the Idaho "Slayer Statute" was also in existence at the time the policy was issued. I.C. § 15–2–803 provides:

**"§ 15–2–803. Effect of homicide on distribution at death:**

"(a)(1) "Slayer" shall mean any person who participates, either as principal or as an accessory before the fact, in the willful and unlawful killing of any other person. . . .

"(b) No slayer shall in any way acquire any property or receive any benefit as a result of the death of the decedent, but such property shall pass as provided in the sections following.

"(c) The slayer shall be deemed to have predeceased the decedent as to property which would have passed from the decedent or his estate to the slayer under the statutes of descent and distribution or have been acquired by statutory right as surviving spouse or under any agreement made with the decedent.

". . . .

"(j)(1) Insurance proceeds payable to the slayer as the beneficiary or assignee of any policy or certificate of insurance on the life of the decedent, or as the survivor of a joint life policy, shall be paid instead to the estate of the decedent, unless the policy or certificate designate some person other than the slayer or his

estate as secondary beneficiary to him in which case such proceeds shall be paid to such secondary beneficiary in accordance with the applicable terms of this policy.

" . . . .

"(n) This section shall not be considered penal in nature, but shall be construed broadly in order to effect the policy of this state that no person shall be allowed to profit by his own wrong, wherever committed."

Since, under I.C. § 15–2–803, Betty Mitchell was disqualified from receiving the proceeds from the policy, Mr. Mitchell's two daughters, Pamela Cay Strack and Linda Jean Wilkins, respondents, sought to recover the benefits from the policy as heirs of Mr. Mitchell. Fireman's Fund refused to pay any of the policy proceeds to either Betty Mitchell or respondents, relying upon exclusion (F) in the policy.

Respondents then brought suit to recover the proceeds of the policy. After motions by both parties for summary judgment, the district court granted summary judgment in favor of respondents. The trial court found that exclusion (F) and I.C. § 15–2–803 conflicted, and, therefore, the statute controlled disposition of the insurance proceeds. Fireman's Fund appeals that decision.

The single issue in this case is whether I.C. § 15–2–803, supersedes exclusion (F) in Norman Mitchell's accidental death policy. Appellant contends that the statute and the exclusion do not conflict and therefore the exclusion controls disposition.

■ We agree with appellant that I.C. § 15–2–803 and exclusion (F) do not conflict. Therefore, exclusion (F) is not superseded by I.C. § 15–2–803. Other courts and commentators that have considered the applicability of "slayer statutes" have held that the statutes apply only when there is no provision whatever in the insurance policy as to the disposition of proceeds when the beneficiary kills the insured. *National Aid Life Ass'n. v. May*, 201 Okla. 450, 207 P.2d 292 (1949); *Sovereign Camp, W.O.W. v. Clark*, 184 Ark. 1035, 44 S.W.2d 336 (1931); *McDade v. Mystic Workers of the*

*World*, 196 Iowa 857, 195 N.W. 603 (1923); *Grand Circle Women of Woodcraft v. Rausch*, 24 Colo.App. 304, 134 P. 141 (1913). *See also* 4 G. Couch, Couch on Insurance 2d, § 27:159 (1984). Where the insurance policy expressly provides for such contingency by relieving itself of all liability, these same courts have held such provisions valid and not superseded by statute.

I.C. § 15–2–803 similarly contemplates the situation where there is no policy exclusion to prevent the wrongdoer from gaining the insurance proceeds. The references in section (c) to "property which would have passed ... to the slayer" and in section (j)(1) to "[i]nsurance proceeds payble to the slayer" presume that under the policy the wrongdoer is entitled to the proceeds. However, since exclusion (F) expressly precludes Betty Mitchell from recovery and relieves Fireman's Fund from all liability, the provisions of I.C. § 15–2–803 do not come into operation.

■ Moreover, statutory amendment by implication is disfavored and will not be inferred, absent clear legislative intent. *Sunshine Mining Co. v. Allendale Mutual Insurance Co.*, 107 Idaho 25, 684 P.2d 1002 (1984). The sole purpose of I.C. § 15–2–803 is to prevent a wrongdoer from profiting from his or her own wrong. I.C. § 15–2–803(n) states that the statute is to "effect the policy of this state that no person shall be allowed to profit by his own wrong ...." The comment to the official text also states:

"At first it may appear that the matter dealt with is criminal in nature and not a proper matter for probate courts. However, the concept that a wrongdoer may not profit by his own wrong is a civil concept, and the probate court is the proper forum to determine the effect of killing on succession to property of the decedent."

For this reason, I.C. § 15–2–803 appears in the intestacy section of the Idaho Probate Code and not in the insurance section of the Idaho Code. Further, there is nothing

in the title of the statute expressing a change in insurance law which would invalidate such exclusions, nor does the statute purport to be a limitation upon the power of an insurance company to avoid liability when a beneficiary kills the insured. Therefore, I.C. § 15–2–803 should not be read to limit the right of insurance companies to contract in this matter.

The decision of the trial court is therefore reversed. Costs to appellants.

No attorney fees on appeal.

BAKES, J., and McFADDEN, J., Pro Tem, concur.

SHEPARD, Justice, dissenting.

I disagree with both the conclusion of the majority and its reasoning process and therefore I dissent.

Norman Mitchell, the deceased, was the insured under a "Certificate of Accidental Death Insurance" insuring against specified loss "resulting directly and independently of all other causes from bodily injuries caused by accident occurring while this policy is in force as to the Applicant Member, herein called such injuries." His wife, Betty Jane Mitchell, was the named beneficiary of said policy. The policy itself named additional classes of beneficiaries, including children, if "there is no surviving designated beneficiary."

Norman Mitchell was murdered. I believe that, from the viewpoint of the decedent such death was accidental and therefore there was coverage under the broad terms of the policy. There is no allegation that Betty Jane Mitchell "committed" or "threatened to commit" bodily injury against her husband. Rather, Betty Jane Mitchell was convicted of first degree murder in the death of her husband in that she had conspired and planned that others should commit the murder of her husband.

Apparently the question involved is misperceived either by the majority or by me. The insurance carrier wrote into the policy an exclusion stating that, "This policy does not cover loss caused by or resulting from ... Any intentional act by a beneficiary or a member of the Member's household to commit or threaten to commit bodily injury to the Member." It is arguable under that exclusion that there is no coverage under the policy, so that the argument regarding beneficiaries simply would not arise. It is arguable that the carrier meant to exclude from risk any coverage arising from a death caused by bodily injury "committed" by a designated beneficiary or family member. Such a restricted coverage, unless otherwise prohibited by statute, appears widely accepted, i.e., the present policy is restricted to "accidental" death and hence there is no coverage for a death resulting from suicide, illness, disease, or similar causes. Other examples of restricted coverage might be circumscription of risk by issuance of a policy covering the insured only when a passenger on a particular commercial airline flight. Although an insurance carrier may limit its risk coverage through an exclusion, it must do so in language clearly accomplishing such purpose and since an insurance contract is a contract of adhesion all ambiguities in the contract will be construed against the insurance carrier.

In the instant case I would hold that the insurance carrier has not clearly excluded the risk presented by the circumstances of the instant case. The record before us does not demonstrate that the beneficiary did "commit" or "threaten to commit" bodily injury. The language of I.C. § 15–2–803, " 'Slayer' shall mean any person who participates, either as principal or as an accessory before the fact, in the wilful and unlawful killing of any other person," demonstrates that language is available to exclude a risk such as is presented by the case at hand.

Since the risk was not excluded, and since the policy provides coverage, the only question is who should receive the face amount of the policy. It is my view that our slayer statute, I.C. § 15–2–803, is a bar to the claim of Betty Jane Mitchell as the designated beneficiary. Subsection (j)(1) of said statute provides, that, in the case of

the beneficiary's having participated in the homicide of the insured:

"Insurance proceeds payable to the slayer as the beneficiary or assignee of any policy or certificate of insurance on the life of the decedent, or as the survivor of a joint life policy, shall be paid instead to the estate of the decedent, unless the policy or certificate designate some person other than the slayer or his estate as secondary beneficiary to him and in which case such proceeds shall be paid to such secondary beneficiary in accordance with the applicable terms of the policy."

The policy at issue provides:

"Indemnity will be payable in a lump sum to the beneficiary of record, who shall be the beneficiary designated in writing and on file with the Bank Sponsor. If, at the death of the Member, there is no surviving designated beneficiary, the indemnity shall be payable in one sum to the first surviving class of the following classes of beneficiaries . . . (3) child or children . . ."

As is well pointed out by the dissent of Bistline, J., the slayer statute also contains the language, "The slayer shall be deemed to have predeceased the decedent . . ."

I would hold that the policy in question does provide coverage for the death of the decedent, the slayer statute prohibits the wife as designated beneficiary from obtaining the proceeds of the policy and as a matter of law establishes that she has predeceased the insured and, pursuant to the policy provisions, the proceeds should be paid to the surviving children, the plaintiffs in the instant case. I would affirm the decision of the district court in its entirety.

BISTLINE, Justice, dissenting.

The district court decision should be upheld. The district court manifestly entertained an overall view of the attendant circumstances to which the majority is blinded. At stake here is a question of public policy. The people of Idaho through their legislature have decreed that public policy in Idaho is against allowing any person to profit or gain from his own wrongful conduct. Such declaration by the legislature is not novel; that philosophy has forever guided the courts of Idaho, and other jurisdictions as well. The majority, for reasons which are wholly unfathomable, hangs the reversal of the district court decision on the flimsy predicate (appearing in the final paragraph) which states that "I.C. § 15–2–803 appears in the intestacy section of the Idaho Probate Code and not in the insurance section." Conceding that the majority has correctly ascertained where § 15–2–803 can be located the Idaho Code, there is no sense or logic whatever to the hypothesis that the statutory law is not the law simply because it is found in a title of the Code other than where the majority poses that it should be found.

The Slayer's Statute, as it has come to be known, after defining "slayer" as a person who participates in the willful and unlawful killing of another person, and after defining property as realty or personalty or any interest therein, declares that: "No slayer shall in any way acquire any property *or receive any benefit* as a result of the death of the decedent, but such property shall pass as provided in the sections following," and in subsequent sections laid out the legal fiction that *"the slayer shall be deemed to have predeceased the decedent . . ."*—thus in the eyes of the law not surviving to take either under the will or by intestate succession.

Notwithstanding the insurance proceeds are by nature personal property, and if not property, per se, certainly a "benefit." A further provision of § 15–2–803 governing insurance policies specifically provided that insurance policy proceeds will not go to the slayer:

(j)(1) Insurance proceeds payable to the slayer as the beneficiary or assignee of any policy or certificate of insurance on the life of the decedent, or as the survivor of a joint life policy, *shall be paid instead to the estate of the decedent,* unless the policy or certificate designate some person other than the slayer or his estate as secondary beneficiary to him in

which case such proceeds shall be paid to such secondary beneficiary in accordance with the applicable terms of this policy.

In the foregoing passage the words "shall be paid to the estate of the decedent" have been underlined. It is hoped that doing so will gain the majority's attention to the fact that the legislature was not without justification for inserting this paragraph into the Probate Code. Experience suggests that slayer statute situations more generally involve realty and personal property other than insurance proceeds than insurance proceeds only.

While it would seem that any legal mind would conclude that the paragraphs of § 15–2–803 dealing with property—above set forth—sufficiently encompass insurance proceeds, because a beneficiary who wrongfully kills the named insured is deemed to have predeceased the insured, the 1971 legislature's additional treatment of insurance proceeds was occasioned by the then recent case of *Anstine v. Hawkins*, 92 Idaho 561, 447 P.2d 677 (1968). The sole issue in that appeal was whether Doris Anstine could succeed to the estate of the husband whose shooting death occurred at her hands. The estate included community property and also involved were the proceeds of a life insurance policy which named Doris Anstine as the beneficiary. The husband's children by a former marriage contended that it was "a violation of public policy to allow" Doris Anstine to inherit or obtain the insurance proceeds. This Court in a unanimous opinion allowed Doris Anstine to prevail. In doing so it observed as to matters of public policy that if the law as written is "socially or otherwise unsound, the power to correct is legislative, not judicial .... The legislature has the resources for the research, study and proper formulation of broad public policy." Like the phoenix, out of the ashes of *Anstine*, arose ¶ (j)(1) of § 15–2–803.

The legislative policy was not, however, that the insurance company selling the policy in question reap the windfall harvest of premiums collected without paying the insurance proceeds to anyone, but, quite the contrary, that the proceeds "be paid into the estate of the decedent, *unless the policy or certificate designate some person other than the slayer or his estate as secondary beneficiary in which case such proceeds shall be paid to such secondary beneficiary ....*"

In such manner did the legislature respond to *Anstine*, setting the public policy of this state that the slayer shall gain neither property nor benefit by his wrongful act, BUT, declaring specifically that insurance proceeds do not lapse, and either go into the estate of the decedent, or to designated secondary beneficiaries. In this case the policy provided that:

"If, at the death of the Insured, there is no surviving designated beneficiary, the indemnity shall be payable in one sum to the first surviving class of the following classes of beneficiaries: (1) wife; (2) husband; (3) child or children; ... (7) estate of the insured."

No. (1) was the slayer, No. (2) was the deceased insured, and (3) are the children. No. 1, Betty Jane Mitchell, is deemed to have predeceased the insured, and hence is not a surviving designated beneficiary. That is the legislature's law. Equally its law, the policy does not lapse. Rather obviously, the majority is far off base in declaring that "The *sole* purpose of I.C. § 15–2–803 is to prevent a wrongdoer from profiting from his or her own wrong." That is *a* purpose of the section, but the section also goes on to provide where the property or insurance proceeds will go when the slayer is deemed to have predeceased the decedent. The majority would have one believe that the legislature so enacted aimlessly, that is, without purpose.

The district court was absolutely correct in its perception that: "The slayer's statute as a matter of sound public policy should take precedence and prevail over provisions of an insurance contract to the contrary." Memorandum Decision, R., p. 59.

The majority would do well to at least attempt a distinction between this case and *Pendlebury v. Western Casualty*, 89 Idaho 456, 406 P.2d 129 (1965), where this Court

succinctly, to the point, and without seeing any need for elaboration, stated: "It is axiomatic that the obligation of I.C. § 41–1839 became part and parcel of the contract of insurance to the same effect as though incorporated therein." 89 Idaho at 470. So axiomatic that the *Pendlebury* opinion provided no citation. But little effort was required to ascertain that the same statement was made in *Fidelity Trust Co. v. State,* 72 Idaho 137, 149, 237 P.2d 1058 (1951). Chief Justice Taylor participated in both *Pendlebury* and *Fidelity Trust. See also Robinson v. Joint School District #150,* 100 Idaho 263, 265, 596 P.2d 436 (1979). If the pertinent provisions of § 15–2–803 are thus part and parcel of the insurance contract now before us, can Fireman's Fund relieve itself of those provisions by inserting into the policy a purported exclusion which overrides and nullifies the statute? I say no. Emphatically no. An insurance company doing business in Idaho cannot override Idaho's public policy.

Our neighboring state of Wyoming early recognized that even where there is not a specific section dealing expressly with insurance proceedings, that those proceeds are *benefits* and must be distributed under the statutory scheme. *Application of Hagood,* 356 P.2d 135, 138 (Wyo.1960). In that same case the court also said, as did this Court in *Pendlebury,* that:

> It is well settled that laws which subsist at the time and place of making of a contract, and where it is to be performed, enter into and become a part of it as though expressly referred to and incorporated in its terms.

*Hagood* was relied upon by the Wyoming Court in *Dowdell v. Bell,* 477 P.2d 170 (1970), where a unanimous court agreed that the provisions of a slayer's statute took precedence over conflicting provisions in the insurance contract—where the primary beneficiary was precluded.

Even absent prior case law form this Court, and even without authority from other jurisdictions, the result achieved by the majority is simply incomprehensible. Whatever else might be said concerning

legislative intent insofar as we are concerned with § 15–2–803, it is impossible to glean therefrom any thought of disqualifying *all* of an insured's beneficiaries from inheriting or property or receiving insurance benefits simply because *one* beneficiary perpetrated a disqualifying homicide.

Moreover, and a thought that may well startle the majority, even in merry old England (where the base proposition first evolved in medieval days) ever since the year 1813 the doctrine of forfeiture of lands and corruption of the blood has been and remained *abolished.* Statute 54 Geo. III c. 45. This, according to the gospel of *Avery v. Everett,* 110 N.Y. 317, 18 N.E. 148 (N.Y.Ct.App.1888), in which state where, as a colony, the doctrine also obtained. Furthermore, a cursory reading of the Constitution of the United States demonstrates that this concept has been riven from American jurisprudence: "The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted." United States Constitution, art. III, § 3, cl. 2.

Without hesitation I submit to my colleagues that it is without the law, and in violation of the public policy of this and all of the 50 states to visit the sins of the father's wife upon the father's children. Or, to the point, an insurance company may not relieve itself of its contractual obligation to pay insurance proceeds to the children of Norman Mitchell simply because of Betty Mitchell's guilt. To so oblige Fireman's Fund, as the majority this day does, is a clear violation of the public policy set by the legislature.

Moreover, putting aside corruption of the blood, I would also uphold the district court on the basis of this statement from our opinion in *Foremost Insurance Co. v. Putzier,* 102 Idaho 138, 627 P.2d 317 (1981):

> Moreover, although the doctrine of reasonable expectations is not the law in Idaho, there is the closely analogous rule of contract construction pointed out by Justice Donaldson in his opinion in *Cor-*

gatelli v. Globe Life & Accident Co., 96 Idaho 616, 533 P.2d 737 (1975), wherein, citing *Shields v. Hiram C. Gardner, Inc., supra,* he wrote:

> *"[t]he doctrine of probability or reasonableness has long been a rule of construction geared toward ascertaining intent in situations of ambiguity. The standard to be applied is what a reasonable person* in the position of the insured *would have understood* the language to mean." 96 Idaho at 622, 533 P.2d at 743. (Donaldson, J., dissenting.)

102 Idaho at 142, 627 P.2d at 321 (emphasis original).

Most people I know who have purchased insurance policies, and they are all reasonable people, would here understand only that they had purchased an accident policy which, in case of death, would pay the sum certain therein designated. Those knowing of the *Anstine* case, and the ensuing statutory law (which all are presumed to know), would reasonably expect only that the perpetrator of the homicide was disqualified from receiving the insurance benefits.

Noting that in the *Foremost* case I was one of the majority there embracing the language of Justice Donaldson in his dissent in *Corgatelli v. Globe Life & Accident Insurance Co.,* 96 Idaho 616, 533 P.2d 737 (1975), I join other members of the bench and bar who have been hard-pressed to find any distinction between that portion of Justice Donaldson's opinion and Justice Shepard's *Corgatelli* opinion wherein the latter wrote:

> The doctrine of reasonable expectations proceeds from an acceptance of the fact that most insurance policies are contracts of adhesion. Ordinarily there can be no bargaining over the terms of the contract. The buyer either accepts the

policy as written or turns elsewhere where he will usually be confronted with the same dilemma resulting from the same terminology. If the layman actually studies the contract he usually becomes bewildered and/or uncertain as to the terminology. He expects that he will be generally insured and does not anticipate these expectations will be upset by an artfully drawn clause that he will be unable to detect or, in the event detected, will be powerless to modify. Indeed, this court can take notice that usually an insured never sees his policy until after he has paid his premium and the contract has been formed.

> . . . .

> The doctrine of reasonable expectations is peculiarly applicable to contracts where as here it is drawn in such a fashion that one hand steals away what the other seemingly confers. A close analysis of the literal meaning of the words in the provision in question solves none of the problems since the literal language is at odds with the reasonable expectations an insured would obtain from the contract.

*Corgatelli, supra,* at 619–21, 533 P.2d at 740–42. As is readily noted, putting ambiguity aside, where Justice Donaldson (and the *Foremost* majority) endorsed "the doctrine of probability or reasonableness," Justice Shepard's terminology was "the doctrine of reasonable expectations." Justice Donaldson declared the applicable standard to be what a reasonable insured would have understood; Justice Shepard wrote the applicable standard to be what a layman reasonably expected.[1] Having been to Missouri, if there is a difference, I say "show it to me." Other than where the insurance salesman has advised the purchaser of insurance what his policy pro-

---

1. Forty-five years ago the nine-member Washington Supreme Court, en banc, stated the applicable standard in almost identical language:

 In our opinion, the proper inquiry is not whether a learned judge or scholar can, with study, comprehend the meaning of an insurance contract, but whether the insurance policy contract would be meaningful to the lay-

 man who at his peril may be legally bound or held to understand the nature and extent of its coverage. *The language of insurance policies is to be interpreted in accordance with the way it would be understood by the average man, rather than in a technical sense. Zinn v. Equitable Life Ins. Co.,* 6 Wash.2d 379, 107 P.2d 921 (1940).

vides, it is inescapable that *an insured's expectations are going to be based on what he understood* from the policy language. If there is not any difference, and where there is a clear legislative directive of public policy involved, why is the majority reversing a district judge who committed no error? If there is a difference, ought not the learned members of this Court be able to illustrate it for the benefit of the bench and bar? ·