OPINION OF THE COURT
John Manning Regan, J.
This is a civil action in Small Claims Court in which the plaintiff, Patricia Mason, a 17-year-old girl, by her mother, Debbie Owens, seeks to recover money damages from Rose M. Ivey, the mother of Sonia Ivey, another 17-year-old girl, for injuries and loss of personal property Patricia suffered during a fight with Sonia.
On April 22, 1986, Sonia Ivey was walking along Seward Street, several blocks away from her house, when she saw Patricia Mason coming toward her on the opposite side of the street. The two girls had lived in the same neighborhood for quite some time, but had not attended school together, nor had they ever become social friends. Sonia crossed Seward Street, and challenged Patricia with words such as, "Don’t act as if you don’t know me”, and then struck her in the face. That attack then erupted into a full-scale assault in which Sonia scratched Patricia’s face, ripped jewelry from her neck and ears, and tore her clothing. When Patricia tried to run away, Sonia pursued her and hit her several times from behind. As a result of this unprovoked aggression, Patricia lost jewelry consisting of three gold neck chains, and a pair of diamond earrings, valued at more than $800; and she also lost the clothing she had worn that day. Moreover, she sustained physical injuries serious enough to visit an emergency room of a local hospital. In all, the damages for the jewelry, the clothing, and her medical bill exceed $1,000.
The evidence adduced at the hearings on October 5, 1987 and October 26, 1987, established that there was no prior history of assaultive behavior on Sonia’s part, and no way in which her mother, Rose, could have foreseen this event. Moreover, Rose Ivey was neither present, nor in the vicinity, when this altercation occurred. For that matter, neither was Patricia’s mother, Mrs. Owens, present or close by. Both parents were at work.
Patricia filed assault charges against Sonia which were adjourned in contemplation of dismissal (CPL 170.55) after several informal sessions at a community dispute resolution center failed to achieve an amicable resolution of the case. The "bone of contention” between the parties remains the *673 unliquidated sums to be paid as damages. Though authorized to do so (CPL 170.55 [4]), the criminal court did not determine an award of damages to Patricia, but has referred all parties to their civil remedies.
Upon all these facts, this court finds that Sonia’s behavior constituted a malicious and destructive act which caused both personal injury and loss of property to Patricia Mason. The court also finds, without dispute in the evidence, that Rose M. Ivey, defendant, was the natural mother of Sonia Ivey on April 22, 1986, and that Sonia was in her custody and was not emancipated from her household at that time.
In view of these factual findings, the court now turns to the question(s) of law which these facts have raised; in particular, New York’s Parental Liability Act.
(1) THE STATUTE
a. General Obligations Law § 3-112.
The current version of this much-amended law has two paragraphs. In paragraph 1, the statute fixes an unconditional monetary liability on all nongovernment parents or guardians,[1] natural or legal, for the malicious and destructive acts of their children, between the ages of 10 and 18, who are in their custody and unemancipated at the time of the damage. This liability is presently limited to the sum of $2,500.
In paragraph 2, the statute grants an indigent parent or guardian, against whom an award in excess of $1,500 has been made, a fact-finding hearing on his financial ability to pay the sums awarded in excess of $1,500; and further allows a court to reduce any such award(s) upon a finding of inability to pay the excess, to the minimum sum of $1,500. However, the statute forbids any modification or reduction below the sum of $1,500.
Thus, this statute imposes an absolute monetary liability on a parent or legal guardian for the malicious and destructive acts of his minor children within his custody to the sum of $1,500 — which liability is predicated solely either on the blood *674 relationship, or on the equivalent legal relationship, of parent and child. It also imposes an additional contingent liability, on the same basis, up to the total sum of $2,500, on parents and legal guardians who have the financial ability to pay those additional sums.
The statute was not always so monolithic in its terms, and, accordingly, a brief history of the statute is indispensable to an understanding of the legislative intent behind it.
b. Legislative History of General Obligations Law § 3-112
Prior to 1970, New York adhered to the common-law rule that parents were not liable for the torts of their children unless they were also guilty of some further act or omission which, in conjunction with the relationship’s duties and obligations, caused the damages. Steinberg v Cauchois (249 App Div 518 [2d Dept 1937]) is the leading case in New York.
Most frequent examples of parental misbehavior at common law were lack of due supervision, entrusting the child with dangerous instrumentalities, or parental failure to safeguard against known vicious propensities in their children.
During the 1960’s, however, parental responsibility statutes, enlarging the scope of parents’ common-law liability, were routinely introduced in the Legislature, and were routinely either killed in committee, or vetoed by Governor Rockefeller.[2] Bill Jacket documents reveal that persistent proponents of these bills were the New York State School Boards Association, seeking fiscal remedies for escalating vandalism in the schools,[3] and the New York State Association of Cemeteries, citing the appalling rise in cemetery maintenance costs due to desecrations by juveniles.[4] Equally persistent opponents comprised the New York State Department of Social Services, who resisted the measures because they would most seriously affect parents who were poor,[5] and the Association of the Bar of the *675 City of New York, whose objections were two-fold: (1) imposing nonfault liabilities on parents and shifting burdens of proof to parents to demonstrate diligence raised constitutional due process issues, and (2) severely limiting the amount of liability (the proposed statute set a limit of $500) foreclosed any practical deterrent objectives which the bills sought to achieve.[6]
Notwithstanding these prolonged battles, legislation finally emerged in the 1970 session which created a parental liability, in the original sum of no more than $500, for malicious and destructive acts of children, whenever the parent had not exercised "due diligence” over the activities of his child. (See, L 1970, ch 993.)[7]
Since that first enactment, there have been amendments in 1977, 1979, 1981, 1982 and 1985. Many of these amendments simply increased the amount of liability (five-fold in 15 years); but the 1979 amendment inserted significant changes in the substantive law. That amendment: (1) eliminated the defense of parental due diligence altogether, and (2) reduced the impact, as a defense, of any restitution the juvenile had paid under the Family Court Act, and (3) added the defense of emancipation. (See, L 1979, ch 138.)
In 1977, the Legislature had passed original legislation amending the Executive Law, the General Municipal Law and the Education Law which established parental liability to cities, school districts, and other public agencies, regardless of their due diligence, for damages to public property caused by the malicious and destructive acts of their minor children. These statutes, which imposed absolute parental liability for damage to public property, and denied parents any due diligence defense in specific prohibitive language, although analogous to General Obligations Law § 3-112, are not within the purview of this private property case. But they were, obviously, the precursors to the 1979 amendments of General Obligations *676 Law § 3-112 (see, L 1977, ch 478) because they were the first to abolish parental due diligence as a defense.[8]
The 1979 Bill Jacket documents contain commentaries signaling a marked departure in legislative intent from the earlier promulgated objectives of 1970. The legislative emphasis during that decade, superficially at least, appeared to move from the compensatory interests of schools and cemeteries, towards a punitive policy against the parents themselves. The published purpose of the 1979 amendment was to coerce a higher level of consciousness in parents as to their financial obligations when their children damaged the property of others. Senator Levy’s sponsoring memorandum states the policy change concisely: "This bill * * * will compel the parent to provide greater supervision of his child’s activities, and to accept greater (financial) responsibilities for developing the child’s respect for the rights and property of others.”[9]
c. Case Law Interpretation
There are no cases under section 171 of the Executive Law and none under section 78-a of the General Municipal Law. The many 1977 amendments to Education Law § 1604 (35); § 1709 (36); § 2503 (18); § 2554 (16-b); and § 2590-g (15) have spawned no reported litigation or case decisions. Only the General Obligations Law has generated reported case decisions on these comparable provisions of the Parental Responsibility Act.
In the only pre-1979 case, Izzo v Gratton (86 Misc 2d 233 [City Ct, Cohoes 1976]), the finding that the parent properly supervised his child, within the foreseeability of his knowledge of the child’s propensities, precluded any recovery by the plaintiff, because parental due diligence was a defense at that time.
Post-1979 cases have had different results. For example, in *677 A. v B. (121 Misc 2d 750 [Sup Ct, Rensselaer County 1983]), that court held that restitution by the juvenile was available as a defense only when the actual damages plaintiff sustained did not exceed the statutory limit of liability ($1,500); and then only pro tanto, with the parent being held liable to the full statutory limit for any uncompensated balance. In 1983, that court was mindful, of course, that diligent supervision was no longer a defense and that restitution had been reduced from a bar to recovery to apportionment status. These kinds of decisions have narrowed the parent’s effective defenses to the Hobson’s choice between termination of the relationship of parent and child (emancipation) and absolute liability.
Despite the paucity of New York cases about statutory parental liability without fault, in derogation of common-law principles, legal literature and case law on the subject elsewhere throughout the country has become prolific.[10] And the constant repetitive factor throughout has been a constitutional attack.
Parents have challenged similar statutes in several States on constitutional grounds — principally urging due process claims, but sometimes also urging equal protection theories. These sister State cases, of course, do not govern the outcome here since the language in the statutes from other States varies a great deal from the New York statute, but they are all valuable sources of legal theory which no court should overlook.
The leading case declaring these types of statutes unconstitutional is Corley v Lewless (227 Ga 745, 182 SE2d 766 [1971]). Its rationale, on a statute which imposed vicarious tort liability solely on the basis of the parent/child relationship, is as follows: " 'To allow any recovery on the basis stated by the statute would deprive the defendant of property without due process of law, would authorize a recovery without liability, and would compel payment without fault’.” (Corley v Lewless, 227 Ga 745, 750-751, 182 SE2d 766, 770, supra, quoting Lloyd Adams Inc. v Liberty Mut. Ins. Co., 190 Ga 633, 641, 10 SE2d 46, 51.)
Most courts, however, have upheld these vicarious liability laws against due process and equal protection claims. (See, Piscataway Twp. Bd. of Educ. v Caffiero, 86 NJ 308, 431 A2d *678 799 [1981];[11] In re John H., 49 Md App 595, 433 A2d 1239 [1982];[12] Rudnay v Corbett, 53 Ohio App 2d 311, 374 NE2d 171 [1977].)
This court, in compliance with its statutory duty under the Small Claims Act (UCCA 1804) to do "substantial justice between the parties according to the rules of substantive law”, and in deference to a plea of "unfairness” from the defendant, has examined the question of the constitutionality of the present statute. Moreover, in accordance with the provisions of section 71 of the Executive Law, and CPLR 1012 (b), this court notified the Attorney-General on December 2, 1987 that this case involved the constitutionality of General Obligations Law § 3-112. On December 30, 1987, the Attorney-General, by letter, acknowledged receipt of the notice but declined to intervene at the trial level. His letter does constitute an appearance in this court in obedience to those statutes.
The Attorney-General has, in his reply, reminded the court that a presumption of constitutionality attaches to every State statute. Perhaps this familiar rule has become more than a presumption. For, in a very recent pronouncement, our Court of Appeals has said: "Enactments of the Legislature — a coequal branch of government — may not casually be set aside by the judiciary. The applicable legal principles for finding invalidity are firmly embedded in the law: statutes are presumed constitutional; while the presumption is rebuttable, invalidity must be demonstrated beyond a reasonable doubt * * * The drastic step of striking a statute as unconstitutional is to be taken only as a last resort”.[13]
This language of our Court of Appeals is somewhat inimical to the historical role of the courts as described by Alexander Hamilton in the Federalist Papers No. 78, wherein he said: "Limitations [on legislative authority] can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing * * * No legislative act, therefore, contrary to the Constitution, can be valid * * * the courts were designed to be an intermediate body between the people and *679 the legislature, in order, among other things, to keep the latter within the limits assigned to their authority.”[14]
(2) THE CONSTITUTIONAL QUESTION
a. Due Process/Equal Protection & Vicarious Liability
Statutes which impose tort liability on parties other than the tort-feasor himself have withstood constitutional challenges in New York since the early days of the twentieth century.[15] Liability has rested, however, in all these cases on the consensual aspect of the relationship between the tortfeasor and the party vicariously liable and the nonintentional nature of the tort. The owner of the car must give his consent to its operator. The employer has hired the employee. The principal has contracted with his agent. In each case, not only is there a consent ab initio to establish the relationship, but there is also a clear reservation of a power of termination. Consent to use the car can be withdrawn. The employee can be fired. The agency can be ended. Further, in all such cases, the party vicariously liable has a measure of control over the tort-feasor’s activity — the car is to be used for a fixed purpose; the employee works in a specific job at a specific place; the agent performs a specified task which has known metes and bounds. And, in no case, is the conduct which imputes liability an intentional or malicious act. Because of these limitations, and because the statutes provide notice of the exposure to liability prior to entering the consensual relationship, parties potentially vicariously liable have been able to secure insurance coverage at reasonable premiums since their experience of potential liability can be actuarially determined.
Not so in the case of the relationship of parent and child. The decision to have children is a permanent commitment. It is not a temporary or ephemeral undertaking. It is also an intensely personal and wholly human act.[16] Parents do not *680 engage in procreation for profit, as do employers when they hire employees, or contractors, agents (cf., In re Baby M., — NJ —, — A2d — [NJ Sup Ct, Feb. 3, 1988]). Once the commitment is made, the relationship of parent and child abides forever regardless of the consequences and risks involved.
Moreover, parents have only a brief time span in which to control their children’s behavior. The formative years quickly yield to an unmanageable adolescence, and the child’s activities become as unpredictable as his excited human imagination can create. In addition, his deliberate and intentional acts soon transcend parental foresight and discipline.
There is no actuarial science competent to circumscribe the risks inherent in this kind of behavior as children mature into adults, and thus there is no insurance actuary available to parents to compute their liability.
Notwithstanding these significant differences between the relationship of parent and child and the other relationships which have become susceptible to vicarious tort liability statutes, the proper legal answer for a court, confronting this issue in litigation, is to refer the parties to the Legislature. Except for suspect classifications based on gender or race, and except for those cases which involve fundamental rights (cf., Roe v Wade, 410 US 113 [1973]), a court’s only inquiry where constitutional substantive due process and equal protection arguments form the phalanx of the litigants’ attack on the law is whether the Legislature had a rational basis for its classifications and judgments.[17] And, certainly, in parental vicarious liability statutes that rational basis is there. In fact, lawmakers have used blood relationships as a basis for vicarious punishment since the days of the Roman Empire.[18]
It is, however, precisely because Legislatures have frequently used blood relationships to extend the severity of punishments to others than the guilty party, that, during the course of history, the subject of punishing the sons, for the sins of the father, or vice versa, has become the focus of constitutional provisions.
In English legal history, the most notorious example of *681 punishments of blood relatives for the crimes of a family member were the infamous bills of attainder, and of pains and penalties, which were inflicted by Parliament upon those it had convicted of felony, and especially of treason. These attainders declared a corruption of blood, together with a forfeiture of all property. Corruption of blood deprived the felon’s heirs of their rights of inheritance and, in effect, stole from them their means of livelihood, and the otherwise just expectations of their own posterity.[19]
The patent injustice of these attainder laws caused much hostility among the public in England, and in North America, to where they had been transplanted during colonial days. For these reasons, the framers of our Federal Constitution considered a virtual prohibition against them. A resolution to that effect was passed in committee, 7 to 3, and was adopted nearly unanimously at the Constitutional Convention in 1787.[20] The prohibition is now part of the US Constitution, article I, §§ 9 (Congress), and 10 (States).
Thus, while legislating a monetary penalty for a parent on account of damage caused by the deliberate and malicious acts of his child may have a sound rational basis in history, and in logic, as an effective deterrent, or preventive threat, and thereby pass muster in the face of a constitutional challenge on due process or equal protection grounds, such a statute does pose, at once, the question of whether it is, in essence, a forbidden bill of attainder — particularly where, as here, the sole basis for the liability is the blood relationship, or its legal equivalent, of parent and child.
For, it is one thing, constitutionally, to predicate vicarious tort liability on a consensual, at will, economic relationship; but quite another, to predicate such liability solely on the blood relationship of parent and child. In the opinion of this court, the former is permitted; but, as follows, the latter is forbidden.
b. A Bill of Attainder
The New York statute is both mechanical and inexorable. The plaintiff’s case consists of proof of the intentional and malicious conduct of the child between the age of 10 and 18 and the damage it has caused. As to these elements, the *682 parent is defenseless. The next item is proof of the blood, or legal, relationship of parent and child. As to this fact, the parent is also defenseless. Once proved, the liability is automatic. In practical operation, the statute has replaced the trial.
The Supreme Court, in United States v Brown (381 US 437 [1965]), has portrayed the Bill of Attainder Clause in the Constitution as a "safeguard against legislative exercise of the judicial function, or more simply — trial by legislature” (United States v Brown, supra, at 442); its aim as being to banish "legislative punishment, of any form or severity, of specifically designated persons or groups” (supra, at 447). Clearly, New York’s Parental Liability Act meets those criteria exactly. The designated group is parents with children between 10 and 18. The punishment, for the malicious, criminal act of the child is a minimum payment of $1,500 — a maximum of $2,500. Moreover, this particular group which the statute punishes, i.e., such parents, has the added historical dimension of a bill of attainder (no longer even necessary under Brown) which is that they are blood relatives of the perpetrator, and are being subjected to punishment solely on that basis.[21]
The most recent Supreme Court analysis of the Bill of Attainder Clause, while somewhat more restrictive, does not stray from the broad principles which Brown (supra) enunciated.[22] What the Nixon court held was that punishment was a necessary ingredient of any bill of attainder. And it advanced three tests to determine that issue: whether the law required traditionally recognized punishments; whether it furthered punitive purposes generally; and whether the Legislature intended to punish when it acted on the bill. Again, New York’s current Parental Liability Act satisfies all three tests. Fines, and other limited monetary penalties, constitute traditional punishment. Levying financial penalties promotes punitive purposes generally. And, as the legislative history recounted above demonstrates, the legislative motive in enactment was both recriminatory and punitive, rather than regulatory or compensatory. Nothing illustrates that these puni *683 tive objectives were dominant in the legislative mind more than the history of this statute. It began with a compromise between the Legislature and Governor Rockefeller in which the Governor agreed to a modest parental liability in the sum of $500, but only when the parent had failed to exercise due diligence. That lasted until Governor Carey’s administration agreed to remove the due diligence defense for any malicious damage to public property. Next came the expansion of the exemption policy to exclude from liability all governmental, and quasi-governmental, parents — such as foster parents. Next came the elimination of the due diligence defense for private property. Next came the dilution of the restitution defense so that it has now become a moribund plea. And, finally, came the proviso that even parents who could prove indigency must face liability in an irreducible sum (now $1,500). Further, with every such amendment, there were steady increases in the amount of the monetary penalty. Taken individually, each of these steps might be ambiguous enough, but taken in the aggregate, these developments clearly manifest the legislative intent to punish only natural and adoptive parents simply for having criminally delinquent children. In effect, the statute now tells a court: Punish natural and adoptive parents for the criminal behavior of their adolescent children in the sum of $1,500 to $2,500.
Were compensatory or regulatory purposes the primary goal no such whittling away would have obtained. The parental liability would have been directly proportionate to the damages, and the basis for parental liability would have continued to contain triable issues of fact. All of that is now absent, and the punitive intent is self-evident.
Moreover, the Parental Responsibility Act is an aberration in New York law. Until its passage in 1970, the behavior of the child was not imputed to the parent,[23] the behavior of the parent was not imputed to the child,[24] and third parties could not enforce either direct liability or contribution from the one on account of the unintentional tort of the other.[25] But this *684 present law abjures the symmetry and consistency of these legislative policies, and makes the parent punitively responsible for the intentional crimes and malicious acts of his minor, adolescent children. While no court should substitute its judgment for the legislative judgment, this dramatic departure from precedent does imply, most strongly, a single-minded and deliberate effort to legislate for motives impermissible under constitutionally outlawed bills of attainder, namely, to punish the parent "for the crimes of his children.
Accordingly, this court finds that General Obligations Law § 3-112, as presently drafted, violates US Constitution, article I, § 10 because it is, in substantial intent, and in practical effect, a bill of attainder.
It is a critical factor in this finding that the only predicate for liability set forth in the statute is the relationship of a parent and child. If the Legislature were to have stipulated any other predicate, such as lack of supervision, or negligence or willful behavior of any sort, the constitutional issue of a bill of attainder would evaporate. But that is not the case, nor is it the history of the statute. The Legislature removed all other predicates, save the parent/child relationship, in 1979; and this court must rule on the law as it is, not on how it was, or on how it might have been.
This finding is not a declaratory judgment. It is only a conclusion of law which assists necessarily in the court’s reaching a judgment for or against the parties to this litigation.[26]
Nor is this finding a usurpation of the prerogatives of our appellate courts. Considering the minor sums of money the statute deals with, and the cost of appellate review in this State, few, if any, litigants would spend the money for an appeal, in lieu of satisfying a judgment. These circumstances dictate that a local court must explore these constitutional issues lest the promises of that great document pass over the vast majority of citizens too poor to afford the processes of any other court.
The complaint is dismissed, with prejudice.

. The statute exempts from all liability governmentally connected agencies and persons in loco parentis, such as the State, the Department of Social Services, and foster parents. Obviously, this exemption policy discloses an intent to segregate only some parents, but not all of them, as objects of retribution. Compensation to the owners of the damaged property is not, therefore, the cardinal purpose of this legislation, an inference which will become much more significant later on this opinion.

. A comprehensive compilation of these efforts, as well as a summary of the statute’s early history, appears in 44 Alb L Rev 943 (1980).

. See, 1970 NY Legis Ann, at 29-30.

. (See, letter to Hon. Robert Douglas, Counsel to Governor Rockefeller, dated Apr. 23, 1970, from Association Attorneys.) The Cemetery Association eventually succeeded in getting its own special law. (See, General Obligations Law § 3-113, enacted in 1978, which does not have a monetary limit.)

. See, Mem to Governor Rockefeller from Commissioner Wyman, Department of Social Services, dated May 8,1970, recommending disapproval.

. See, Mem from Comm on Fam Law, Assn of Bar of City of NY, to Governor Rockefeller dated May 15,1970.

. The statute barely changed the common law. It shifted the burden of proof of diligence from the plaintiff to the defendant parent, and gave a remedy for an intentional tort. It did not, however, repeal common-law theories of liability founded on negligence, nor did it limit common-law recoveries to $500. However, subsequent case law has extensively curtailed those actions. (See, Holodook v Spencer, 36 NY2d 35 [1974]; Russo v Osofsky, 112 AD2d 926 [2d Dept 1985].)

. The companion 1977 amendment to General Obligations Law § 3-112, which added the exception preamble at the beginning of the statute, became obsolete when the 1979 amendment to General Obligations Law § 3-112 also abolished the due diligence defense for private property. That 1979 amendment made the 1977 exception preamble no longer appropriate, but it remains notwithstanding.

. Memorandum in support of S 1258 dated May 17, 1979. Since the bill Senator Levy was sponsoring removed parental due diligence as a defense, the reader can only wonder at the logical inconsistencies of the legislative process.

. See, e.g., 12 Baltimore L Rev 171 (1982); 34 Rutgers L Rev 220 (1981); 49 Tul L Rev 1194 (1975); 55 Marq L Rev 584 (1972); 23 Mercer L Rev 681 (1972); 47 Notre Dame L Rev 1321 (1972).

. Cf., 34 Rutgers L Rev 220 (1981).

. Affd 293 Md 295, 443 A2d 594 (1982), without reaching the constitutional issue.

. Matter of McGee v Korman, 70 NY2d 225, 231 (1987).

. The Federalist No. 78 (Hamilton) (McLean’s ed 1788).

. See, e.g., Matter of White v New York Cent. & Hudson R. R. Co., 216 NY 653 (1915), affd 243 US 188, upholding workmen’s compensation laws. Compare also, Atkins v Hertz Drivurself Stas., 261 NY 352 (1933), upholding liability of owners for negligence of operators of automobiles.

. While any regulation of procreation and choice in respect to the parent/child relationship does raise serious questions concerning the right to privacy (cf., Griswold v Connecticut, 381 US 479 [1965]), that issue is not implicit in the statutory history of these parental responsibility acts.

. Williamson v Lee Opt. Co., 348 US 483 (1955).

. Under the "Institutes” of the Roman Civil Law, any parent convicted of a major crime forfeited his children to the State. (See, Commentaries of Gaius, 1st Commentary j[ 128.) It was a severe punishment — as great a penalty to the child, as to the parent.

. Cf., Stephen, 1 History of Criminal Law of England 487 (1883).

. See, Farrand, 2 Records of Federal Convention of 1787, at 375-376, 440 (1966).

. Cases in New York have recognized corruption of blood consequences of bills of attainder at common law, the principal consequence being, as here, a penalty or a forfeiture of property. (Avery v Everett, 110 NY 317 [1888].)

. Nixon v Administrator of Gen. Servs. (433 US 425 [1977]) concerned the expropriation of President Nixon’s personal papers by the Congress in a bill which named him individually.

. See, n 7, supra.

. See, Laws of 1935 (ch 796), Laws of 1963 (ch 576), now codified as General Obligations Law § 3-111, stating the rule that parental negligence is not imputed to infant children. Prior to this statute, parental negligence was imputed only where the child’s behavior was tantamount to adult behavior. (Novak v State of New York, 199 Misc 588 [1950].)

. See, Holodook v Spencer (36 NY2d 35 [1974]) for a thorough historical review of such laws.

. Accordingly the various parental liability acts for public property damage, outlined above, at 675-676, remain unaffected.